# EXHIBIT 1

PLAN OF LAND IN MASHPEE

Whitney & Bassett, Engineers

July 1954

25209<sup>A</sup>



Gooseberry

Island

Punkhorn

Point

POPONESSET "By" BAY

Mean High Water Mark

Town Line Bound
"1894 D-C"
See Town Boundary
Survey of Barnstable
and Mashpee

N 17° 54' 05" E
About 3963 to C-D
Town Line Bound

N 18° 28' 50"
311.36

N 60° 30' 50" W
129.95

C.B.

C.B.

S.B.

Copy of part of plan
filed in
LAND REGISTRATION OFFICE
Aug 2, 1954
Scale of this plan 80 feet to an inch
C.M. Anderson, Engineer for Court /s
48—1—7

**EXHIBIT 2**

45,720

Statute Form of

## Quitclaim Deed

[BY CORPORATION]

FIELDS POINT
MANUFACTURING CORPORATION
(1953)
TO

_Mr̲t̲ _ _ _ _ _ _ _ _

STURE NELSON

26 December __

_____ 19

at _____ o'clock and _____ minutes ____ m.

Received and entered with _____

_____ Deeds

Book _____ Page _____

Attest:

_____
Register

FROM THE OFFICE OF

Frederick D. Nichols
7 Water Street
Boston, Massachusetts

HOBBS & WARREN, INC.
PUBLISHERS STANDARD LEGAL FORMS
BOSTON · MASS.

Form 884

L.C.#25209.

Barnstable Registry District

SEP 30 1955

RECEIVED FOR REGISTRATION
AT 9 O'CLOCK 05 m. A M
REINV OFFICIAL CERTIFICATE No. 1 P 3 5 5 8
REGISTRATION BOOK 136 PAGE
noted on ct. 18360 X

## CERTIFICATE

I, Gerard J. Quinton, hereby certify that I am Secretary of the Board of Directors of Fields Point Manufacturing Corporation (1953) a corporation of the State of Rhode Island, and that the following is a true, correct and complete copy of vote passed at a regular meeting of the Board of Directors of Fields Point Manufacturing Corporation (1953) duly held September 15, 1953, at which meeting a quorum was present and acting throughout, and that said vote is now in full force and effect:

VOTED: That any one of the following named individuals be and he hereby is authorized and empowered in the name and on behalf of the corporation, and with the corporate seal, to negotiate and execute contracts for the sale of any real estate of the corporation and for the purchase of real estate for the corporation, and deeds of real estate of the corporation, upon such terms and conditions, and in such form as to either of them seems desirable:

Malcolm G. Chace, Jr.

Arnold B. Chace

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of Fields Point Manufacturing Corporation (1953) this 22nd day of September 1960.

Secretary of the Board of Directors

Clerk.

FIELDS POINT MANUFACTURING CORPORATION (1953)

a corporation duly established under the laws of Rhode Island
and having its usual place of business at Providence

~~County, Massachusetts~~, for consideration paid,

grants to STURE NELSON, married to Florence B. Nelson, both of 26
Sycamore Street, Norwood, Norfolk County, Massachusetts

with quitclaim covenants

~~the land in~~

[Description and encumbrances, if any]

A certain parcel of land in Mashpee, Barnstable County, bounded
and described as follows:

A certain island commonly known as Gooseberry Island and bounded on

all sides by Popponesset Bay and shown on Plan numbered 25209A, filed

with original Certificate of Title issued on decree in Land Court Case

No.25209 Fields Point Manufacturing Corporation (1953), the same being

compiled from a plan by Whitney & Barrett, Engineers, dated July 1954,

and addition of data on file in the Land Registration Office, all as

modified and approved by the Court.

See Vote recorded Barnstable Registry of Deeds attached hereto.

   

**In witness whereof**, the said FIELDS POINT MANUFACTURING CORPORATION (1953)

has caused its corporate seal to be hereto affixed and these presents to be signed, acknowledged and

delivered in its name and behalf by *Arnold B Chace*

its _____ hereto duly authorized, this *twenty - second*

day of *September* in the year one thousand nine hundred and fifty-five

Signed and sealed in presence of

*Ruth E. Campbell*

FIELDS POINT MANUFACTURING CORPORATION(1953)

by *Arnold B Chace*

STATE OF RHODE ISLAND
~~The Commonwealth of Massachusetts~~

*Providence* ss. *September* 22 1955

Then personally appeared the above named *Arnold B. Chace*

and acknowledged the foregoing instrument to be the free act and deed of the FIELDS POINT MANUFACTURING
CORPORATION (1953)

before me,

*Gerard C. Dunbar*
Notary Public — ~~Justice of the Peace~~

My commission expires *June 30 195_*

# STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

### OFFICE OF THE CLERK OF THE
### SUPERIOR COURT

PROVIDENCE, SC.                    PROVIDENCE, _Sept._ _13_ A. D. 19_3_

I, MATTHEW M. McCORMICK, *Clerk of the Superior Court of said State for the Counties of Providence and Bristol, the same being a Court Record and having by law a seal,*

DO HEREBY CERTIFY, *that* _Gerald J. Crandon_

*whose name is subscribed to the annexed certificate was at the time of signing said certificate a NOTARY PUBLIC in and for said State, residing in said County of* _Providence_

*duly appointed and qualified, and authorized to administer oaths and take depositions and to take the acknowledgment or proof of deeds or conveyances of lands, tenements or hereditaments lying in said State and which deeds or conveyances are to be recorded in said State; that I am well acquainted with the handwriting of said* _____

*and verily believe that the signature to the said Certificate, purporting to be his, is genuine; that the laws of said State do not require the use of a seal by a notary and no copy of a notary's seal is on file or required to be on file in this office.*

In attestation whereof, *I hereunto subscribe my name, and affix the seal of said Court, the day and year above written.*

_Matthew M. McCormick_ ,Clerk.

# EXHIBIT 3

291537

87996

noted on ctf 1838 8 x    7% - 8%

7320    0025.37 —

FEB 11 10 12 AM 1982

STEPHEN WEEKES
REGISTER

(Please print or type)

*(Left margin, vertical text: Address of Property: Island in Poponesset Bay)*

I, STURE NELSON

of     Norwood, Norfolk                                             County, Massachusetts

~~being unmarried~~, for consideration paid, and in full consideration of — nominal —

grants to     ROBERT JAMES NELSON AND BETSY A. NELSON *Husband + Wife*
                                                    *TENANTS BY ENTIRETY* —

of      14 Spruce Road, Norwood, Mass.,                with quitclaim covenants

the land in Mashpee in the County of Barnstable and Commonwealth of

(Description and encumbrances, if any)

Massachusetts, bounded and described as follows:

A certain Island commonly known as Gooseberry Island and
bounded on all sides by Poponesset Bay and shown on plan 25209-A,
the same being compiled from a plan drawn by Whitney & Bassett,
Engineers, dated July 1954, and additional data on file in the
Land Registration Office at Boston, all as modified and approved
by the Court, a copy of a portion of which is filed in Barnstable
County Registry of Deeds in Land Registration Book 135, page 100
with Certificate of Title No. 18360.

*For title see certificate # 18388*

Witness my hand and seal this 9th day of October 19 81

*Sture Nelson*

The Commonwealth of Massachusetts

NORFOLK,     ss.                        October 9      1981

Then personally appeared the above named   Sture Nelson

and acknowledged the foregoing instrument to be     his     free act and deed, before me

*A. Clinton Kellogg*
Notary Public — Justice of the Peace

A. Clinton Kellogg
My commission expires     10-15-1987

(*Individual — Joint Tenants — Tenants in Common — Tenants by the Entirety.)

CHAPTER 183 SEC. 6 AS AMENDED BY CHAPTER 497 OF 1969

Every deed presented for record shall contain or have endorsed upon it the full name, residence and post office address of the grantee
and a recital of the amount of the full consideration thereof in dollars or the nature of the other consideration therefor, if not delivered
for a specific monetary sum. The full consideration shall mean the total price for the conveyance without deduction for any liens or
encumbrances assumed by the grantee or remaining thereon. All such endorsements and recitals shall be recorded as part of the deed.
Failure to comply with this section shall not affect the validity of any deed. No register of deeds shall accept a deed for recording unless
it is in compliance with the requirements of this section.

*(handwritten at bottom) LAND ON PLAN 25209-A (LOT 18360)*

**EXHIBIT 4**

560931　　127604
woted as JC 87976
1046-44

# Quitclaim Deed

STATUTE FORM

BARNSTABLE COUNTY
REGISTER OF DEEDS
JOHN F. MEADE

AUG 24  3 18 PM '92

RECEIVED

TO

Dated,　　　　　　　19

_____19 _____

at _____ o'clock and _____ minutes _____ m.

Received and entered with _____

_____ Deeds

Book _____ Page _____

Attest:

Register

TUTTLELAW REGISTERED U.S. PAT OFFICE
TUTTLE LAW PRINT PUBLISHERS RUTLAND VT 05701

FORM 281  Rev R-85

DUNNING, FORMAN, KIRRANE & TERRY
ATTORNEYS AT LAW
ROUTE 28, BOX 560
MASHPEE, MASS 02649

We, Robert James Nelson and Betsy A. Nelson, husband and wife, tenants by
the entirety

of  97 Valley Brook Road, Centerville, MA          Barnstable     County, Massachusetts

in consideration of    nominal

grant to     Robert J. Nelson, Jr.

of   251 Franklin Street, Mansfield, MA  02048          with quitclaim covenants

the land in  Mashpee, bounded and described as follows:

A certain Island commonly known as Gooseberry Island and bounded
on all sides by Poponesset Bay and shown on Plan 25209-A dated July, 1954,
drawn by Whitney & Bassett, Engineers, and filed in the Land Registration
Office at Boston, a copy of which is filed in Barnstable County Registry of
Deeds in Land Registration Book 135 Page 100 with Certificate of Title
No. 18360.

For our title see Certificate of Title No.87996

Executed as a sealed instrument this   21st   day of   August   19 92

_Robert James Nelson_
Robert James Nelson

_Betsy A. Nelson_
Betsy A. Nelson

## The Commonwealth of Massachusetts

Barnstable,                  ss.                        Aug. 21, 19 92

Then personally appeared the above named

Robert James Nelson and Betsy A. Nelson

and acknowledged the foregoing instrument to be   their  free act and deed.

Before me, _Donald E. Terry_                        Notary Public
Donald E. Terry                                     Justice of the Peace
My commission expires  6-1-14                        19 96

Mash- Gooseberry Island, Pl 25209-A

**EXHIBIT 5**

QUITCLAIM DEED

I, Robert J. Nelson, Jr., of 251 Franklin Street, Mansfield, Massachusetts 02048,

for no consideration paid, grant to

Robert D. Emmeluth, Trustee of Gooseberry Island Trust, under declaration of trust dated September 2, 2011, and filed with the Barnstable Registry District of the Land Court herewith as Document No. 1,173,403 , c/o Boudreau and Boudreau, LLP, 396 North Street, Hyannis, Massachusetts 02601,

with Quitclaim Covenants,

the land, situated in Mashpee, Barnstable County, Massachusetts, and more particularly described as follows:

Being a certain island commonly known as Gooseberry Island and bounded on all sides by Poponesset Bay and shown on Land Court Plan No. 25209-A, dated July 1954, drawn by Whitney & Bassett, Engineers, and filed in the Land Registration Office at Boston, a copy of which is filed with the Barnstable Registry District of the Land Court in Land Registration Book 135, Page 100, with Certificate of Title No. 18360.

Property Address: Gooseberry Island, Mashpee, Massachusetts.

For title, see Certificate of Title No. 127604.

Witness my hand and seal this 12th day of September , 2011.

Robert J. Nelson, Jr.

COMMONWEALTH OF MASSACHUSETTS

Barnstable, ss:

On this 12th day of September , 2011 before me, the undersigned notary public, personally appeared Robert J. Nelson, Jr., proved to me through satisfactory evidence of identification, which was Driver's License , to be the person whose name is signed

on the preceding or attached document, and acknowledged to me that he signed it voluntarily and for its stated purpose.

JOHN J. ROCHE
NOTARY PUBLIC
COMMONWEALTH OF MASSACHUSETTS
MY COMMISSION EXPIRES MAY 23, 2014

_____, Notary Public

My Commission Expires: _____

2

# EXHIBIT 6

TRUSTEE'S CERTIFICATE
APPOINTMENT, ACCEPTANCE OF TRUSTEE
AND RESIGNATION OF TRUSTEE
FOR GOOSEBERRY ISLAND TRUST

I, Robert D. Emmeluth, of c/o Boudreau and Boudreau, LLP, 396 North Street, Hyannis, Massachusetts 02601, Trustee of Gooseberry Island Trust, under declaration of trust dated September 2, 2011, and filed with the Barnstable Registry District of the Land Court as Document No. 1,173,403, hereby certify that, on the date hereof, _Matthew Haney_, of _Boston, MA_____, was duly appointed as trustee of the said Gooseberry Island Trust, by unanimous vote of all of the beneficiaries of said trust.

SUBSCRIBED AND SWORN to under the pains and penalties of perjury this _S_ day of _July_, 20_13_.

_Robert D. Emmeluth_
Robert D. Emmeluth

COMMONWEALTH OF MASSACHUSETTS

County of _Barnstable_

On this _S_ day of _July_, 20_13_, before me, the undersigned notary public, personally appeared Robert D. Emmeluth, proved to me through satisfactory evidence of identification, which was _CTDL_____, to be the person whose name is signed on the preceding or attached document, and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of his knowledge and belief.

TARA O'CONNELL
Notary Public
Commonwealth of Massachusetts
My Commission Expires December 19, 2019

_Tara O'Connell_, Notary Public
My Commission Expires: _12/19/12_

Property:

Gooseberry Island, Mashpee, Massachusetts
Land Court Plan No. 25209-A
Certificate of Title No. 195170

## ACCEPTANCE OF TRUSTEE
## OF
## GOOSEBERRY ISLAND TRUST

N O T        N O T
A N        A N
O F F I C I A L    O F F I C I A L
C O P Y        C O P Y

I, _Matthew Haney_, of _Boston, MA_____,
hereby accept my appointment as trustee of Gooseberry Island Trust, under declaration of trust
dated September 2, 2011, and filed with the Barnstable Registry District of the Land Court as
Document No. 1,173,403, effective this date.

N O T        N O T
A N        A N
O F F I C I A L    O F F I C I A L
C O P Y        C O P Y

WITNESS my hand and seal this _5_ day of _July_____, 20_13_

## COMMONWEALTH OF MASSACHUSETTS

County of _Barnstable_

On this _5_ day of _July_____, 20_13_ before me, the undersigned notary
public, personally appeared _Matthew Haney_____, proved to me through satisfactory
evidence of identification, which was _MADL_____, to be the person whose
name is signed on the preceding or attached document, and acknowledged to me that he/she
signed it voluntarily for its stated purpose.

TARA O'CONNELL
Notary Public
Commonwealth of Massachusetts
My Commission Expires December 19, 2019

_Tara O'Connell_, Notary Public
My Commission Expires: _12·19·19_

Property:

Gooseberry Island, Mashpee, Massachusetts
Land Court Plan No. 25209-A
Certificate of Title No. 195170

2

BARNSTABLE REGISTRY OF DEEDS
John F. Meade, Register

RESIGNATION OF TRUSTEE
OF
GOOSEBERRY ISLAND TRUST

NOT AN OFFICIAL COPY

I, Robert D. Emmeluth, of c/o Boudreau and Boudreau, LLP, 396 North Street, Hyannis, Massachusetts 02601, Trustee of Gooseberry Island Trust, under declaration of trust dated September 2, 2011, and filed with the Barnstable Registry District of the Land Court as Document No. 1,173,407, hereby resign as trustee of the said Gooseberry Island Trust.

WITNESS my hand and seal this 5 day of July , 20 13

Robert D. Emmeluth

COMMONWEALTH OF MASSACHUSETTS

County of Barnstable

On this 5 day of July , 2013, before me, the undersigned notary public, personally appeared Robert D. Emmeluth, proved to me through satisfactory evidence of identification, which was CT DL , to be the person whose name is signed on the preceding or attached document, and acknowledged to me that he signed it voluntarily for its stated purpose.

TARA O'CONNELL
Notary Public
Commonwealth of Massachusetts
My Commission Expires December 19, 2019

Tara Oconnell , Notary Public
My Commission Expires: 12/19/19

Property:

Gooseberry Island, Mashpee, Massachusetts
Land Court Plan No. 25209-A
Certificate of Title No. 195170

BARNSTABLE REGISTRY OF DEEDS
John F. Meade, Register

# EXHIBIT 7

men, instead of causing such horses to be sold, may transfer them to the custody of the charitable society incorporated under the name of Red Acre Farm, Incorporated, or to any other charitable society incorporated in this commonwealth for the prevention of cruelty to animals, or for the care and protection of dumb animals, if the society is willing to accept the custody thereof, to be disposed of in such manner as the said society may deem best: *provided*, that the society upon receiving any such horse shall give a written agreement not to sell the horse or to let the same for hire. If any horse so received shall thereafter be sold or let for hire, the proceeds of such sale or letting shall be the property of the city or town, and custody of the horse shall revert to the city or town.

*Proviso.*

SECTION 2. This act shall take effect upon its passage.
*Approved February 27, 1908.*

---

An Act to authorize the construction of three bridges in the town of Mashpee.

*Chap.*134

*Be it enacted, etc., as follows:*

SECTION 1. Theodore H. Tyndale, his associates and assigns, are hereby authorized to build and maintain in the town of Mashpee a bridge across Mashpee river from Mashpee neck to the mainland lying westerly therefrom; a bridge from Gooseberry island in Popponesset bay to the mainland lying westerly therefrom; and a bridge from Popponessett island to the mainland lying westerly therefrom; all subject to the provisions of chapter ninety-six of the Revised Laws and in accordance with such plans as may be approved by the board of harbor and land commissioners.

Bridges may be constructed in the town of Mashpee, etc.

Certain provisions of law to apply, etc.

SECTION 2. This act shall take effect upon its passage.
*Approved February 27, 1908.*

---

An Act to include the town of Dana within the first medical examiner district of the county of Worcester.

*Chap.*135

*Be it enacted, etc., as follows:*

SECTION 1. The town of Dana is hereby annexed to and made a part of the first medical examiner district of the county of Worcester.

Town of Dana included in first medical examiner district of Worcester county.

**EXHIBIT 8**

# Commonwealth of Massachusetts.



5 4 2 5.

**Whereas,** Theodore H. Tyndale, ————————————————

Boston ————, in the County of Suffolk———— and Commonwealth aforesaid, ha s

is authorized by the General Court, by chapter 134 of the acts of the year 1906 , to con-
struct three bridges ————————————————————

and over the tidewaters of Hashpee River and Popponessett Bay, ————————

the town —— of Hashpee ———— in the County of Barnstable ————————
Commonwealth aforesaid; and before beginning said work ha s given written notice to the Board
Harbor and Land Commissioners of the work intended to be done, and submitted, for the approval of
Board, Plans showing in detail the location and dimensions of said work, and the mode in which the
same is to be performed; and whereas due notice of said application, and of the time and place fixed for
hearing thereon, has been given, as required by law, to the Selectmen————————

the town —— of Hashpee ————————;

**Now,** said Board, having heard all parties desiring to be heard, and having fully considered said
application, hereby approves the Plan for said work hereto annexed, and the mode of performing the same
shown thereby, and subject to the approval of the Governor and Council hereby authorizes and licenses
said work to be done in accordance therewith, subject to the provisions of the ninety-sixth chapter of the
Revised Laws, and of all laws which are or may be in force applicable thereto.

The work hereby licensed and approved is the construction of
three pile bridges in the town of Hashpee, as follows: A bridge
across Hashpee River from Hashpee neck to the mainland lying west-
erly therefrom; a bridge from Gooseberry island in Popponessett
Bay to the mainland lying westerly therefrom; and a bridge from

Popponessett island to the mainland lying westerly therefrom, in conformity with the accompanying plan No. 3 4 2 5, which shows the location and method of construction of said bridges.

The clear head room at each bridge shall be not less than five feet above mean high water, and the bridge across Mashpee River shall be built with a draw therein having a clear opening of not less than 30 feet.

This license is granted subject to the laws of the United States.

A duplicate of the aforesaid Plan, numbered 3 4 2 5 _____ , remains on file in the office of said Board, and said work is to be performed under its supervision.

Nothing herein contained shall be so construed as to impair the legal rights of any person. The amount of tidewater displaced by the work aforesaid shall be ascertained by said Board and the

compensation therefor shall be made by the said

heirs, successors and assigns, by paying into the treasury of the Commonwealth

cents for each cubic yard so displaced

being the amount hereby assessed by said Board, the same to be reserved as a compensation fund for the

harbor of

This license is granted in consideration of the payment into the treasury of the Commonwealth by the

the rights and privileges hereby granted in land of said Commonwealth, of the further sum of

the amount determined by the Governor and Council to be just and equitable therefor.

This license shall be void unless the same, and the accompanying Plan, are recorded, within one year

the date hereof, in the Registry of Deeds for the —————————————— District of the County of

arnstable.

**In Witness Whereof,** said Board of Harbor and Land Commissioners have hereunto set their

this twenty-second ————————————— day of December, ————————————

the year nineteen hundred and nine.

Geo. E. Smith ............................⎫ *Harbor and*

Samuel M. Mansfield ...............⎬ *Land*

Heman A. Harding ..................⎭ *Commissioners.*

COMMONWEALTH OF MASSACHUSETTS.

Boston, ——————————————— 190

roved by the Governor and Council.

true copy.
Attest:

Clerk of Board.

**EXHIBIT 9**

MASHPEE ZONING BOARD OF APPEALS
PETITION FOR A VARIANCE
Under Massachusetts General Laws Chapter 40A §10 and
Town of Mashpee Zoning By-laws

TO:  Mashpee Zoning Board of Appeals          Date: August 29, 2013

The undersigned Petitions the Mashpee Zoning Board of Appeals to vary, in the manner and for
the reasons hereinafter set forth, the application of the provisions of the Zoning By-laws to the
following described premises:

Property Address: 0 Gooseberry Island          Zoning District: R-3

Current Property Owner: Robert D. Emmeluth, Trustee of Gooseberry Island Trust

 c/o Boudreau & Boudreau, 396 North Street, Hyannis, MA 02601
(Address) c/o Kevin M. Kirrane, P. O. Box 560, Mashpee   (Telephone #) (508) 477-6500

Registry of Deeds Title Reference: Book:_____ Page: _____

or Certificate of Title #: ___195170___ and Land Court Lot #:_____–_____ and

Plan #:__25209-A___

Assessor's Map/Parcel: Map:___100___ Parcel:__6-0-R___

Dimensions of Lot:__n/a___          300± feet  Area:  3.9 acres
          Frontage          Depth          Square Feet

How long have you owned the premises?  since 9/11

Current use of premises: Island

Dimensions of existing building(s) on the premises: _____n/a_____

Dimensions of proposed construction:____n/a____

Pertinent Section(s) of the Zoning By-laws and Variance relief requested: Section 174-31,

 Lot Frontage, Section 174-12 and Section 174-32

Have you submitted plans for above to the Building Department? ___no___

ZBA Public Hearings date scheduled for:_____     TOWN CLERK
                                                             DATE STAMP:

_____
Petitioner's Signature

_____
Agent's Signature  Kevin M. Kirrane, Esquire
Dunning, Kirrane, McNichols & Garner, LLP
P. O. Box 560, Mashpee, MA 02649
Agent's Address/Phone # (508) 477-6500

*TOWN OF MASHPEE*
*ZONING BOARD OF APPEALS*


APPLICATION FOR VARIANCE

GOOSEBERRY ISLAND TRUST


*Respectfully Submitted,*

*Kevin M. Kirrane, Esq.*
*DUNNING, KIRRANE, McNICHOLS & GARNER, L.L.P.*
*P.O. Box 560*
*Mashpee, MA 02649*


October 9, 2013

NATURE OF APPLICATION

The applicant Robert D. Emmeluth, Trustee, is the owner of a parcel of land commonly referred to as Gooseberry Island. Given the fact that the property is an Island, in order to build upon it, there is a need for Variance Relief from the Zoning Board of Appeals.

The applicant seeks relief from the frontage requirements set forth in both Sections 174-12 and 174-31 of the By-Law and from the Fire Protection By-Law, so called, Section 174-32, in order to establish this three (3) plus acre parcel as buildable.

BACKGROUND

While it is not currently occupied, the Island was used by previous owners as a cottage or camp for camping, hunting and fishing. As shown on the plan submitted with the application, the remnants of a building foundation and well are still visible on the Island. In addition, the Land Court Decree Plan dating back to the 1950's shows a structure on the Island. (See Plan attached hereto and marked as Exhibit A.) The property was owned by the Nelson family for more than 50 years and in 2011 the property was conveyed to the current owner. As indicated in Mr. Nelson's Affidavit, his family members would park at the end of Punkhorn Point Road and use a row boat to access the Island throughout those years. (See Affidavit attached hereto and marked as Exhibit B.)

The applicant hopes to obtain all necessary permits to develop the Island for one (1) single family residence.

APPLICABLE ZONING

Section 174-12 provides in pertinent part that:

> "no building shall be erected except on a lot fronting
> on a street"

Given the land in question is an Island and currently accessible by foot (at low tide) or by boat, it lacks frontage on a street.

Section 174-31 requires a lot for building purposes to have 150' of frontage on a street in the applicable R-3 Zoning District. The parcel in question has 0' of frontage on a street.

Section 174-32 requires an unobstructed paved access roadway within 150' of the furthest point of any building on the lot. Again, given the parcel in question is surrounded by water, that type of unobstructed parcel access cannot be provided.

VARIANCE RELIEF

Both State Law and our local By-Law authorize the local Zoning Board of Appeals to grant Variance Relief under certain circumstances. Massachusetts General Laws Chapter 40A, Section 10 sets forth the criteria which must be considered by the Board when acting upon Variance requests.

A Board is at liberty to grant Variance Relief where:

> "owing to circumstances relating to the soil
> conditions, shape or topography of such land
> or structures and especially affecting such land
> or structures but not affecting generally the
> zoning district in which it is located, a literal
> enforcement of the provisions of the ordinance

> or by-law would involve substantial hardship,
> financial or otherwise, to the petitioner or
> appellant, and that desirable relief may be
> granted without substantial detriment to the
> public good and without nullifying or substantially
> derogating from the intent or purposes of such
> ordinance or by-law."

In this particular instance, given that the parcel of land is an Island surrounded on all sides by water, I believe would satisfy the criteria relating to circumstances of shape, soil condition and topography especially affecting this land but not affecting generally the Zoning District (R-3) in which it is located.

A literal enforcement of the By-Law would result in a substantial hardship should the applicant not obtain variance relief from frontage and access requirements, since nothing could be built on the Island without such relief. Additionally, having a physical presence on the Island could help in preventing dumping, vandalism and damage to the surrounding Wetland Resource Areas.

The desired relief can be granted without detriment to the public good and without derogating from the intent of the By-Law as only one dwelling would ultimately be built on this three (3) plus acre parcel, which will comply with all other zoning regulations. Health, conservation and environmental issues will be considered and addressed by other Boards or Committees. In addition, the applicant will install a code compliant fire sprinkler system in a prospective dwelling and welcomes a condition to the effect should the requested Variance Relief be granted. (See e-mail communication from Chief Baker dated August 12, 2013 attached hereto and marked as Exhibit C.)

3

The Board is no stranger to the grant of this type of relief in the Punkhorn Point area. In fact, both 1999 and 2005 similar relief was granted to the owners of properties situated at 84 Punkhorn Point Road and 80 Punkhorn Point Road. (See Decisions attached hereto and marked as Exhibit D and D-1.)

CONCLUSION

For those reasons stated herein and in the documentation to be submitted at the public hearing, the applicant respectfully suggests that he has met the criteria necessary for the grant of Variance Relief under G.L.C. 40A§10. As such it is requested that the Board act favorably upon said request.

Respectfully Submitted,
Gooseberry Island Trust
By its Attorney,

Kevin M. Kirrane, Esquire
Dunning, Kirrane, McNichols & Garner, L.L.P.
P. O. Box 560
Mashpee, MA 02649
(508) 477-6500

4

EXHIBIT "A"

PLAN OF LAND IN MASHPEE

Whitney & Bassett, Engineers

July 1954

25209 A

Town Line Bound
"1894 D-C"
See Town Boundary
Survey of Barnstable
and Mashpee

Gooseberry

Island

Punkhorn

Point

POPONESSET BAY

Copy of part of plan
filed in
LAND REGISTRATION OFFICE
Aug 2, 1954
Scale of this plan 80 feet to an inch
C.M. Anderson, Engineer for Court
46-1-7

L.A.M.

EXHIBIT "B"

## AFFIDAVIT

I, Robert J. Nelson, Jr., of 251 Franklin Street, Mansfield, Massachusetts, after being duly sworn, do depose and say as follows:

1. That I am the owner of that certain island, situate in Mashpee, Massachusetts, commonly known as Gooseberry Island and bounded on all sides by Poponesset Bay and shown on Land Court Plan No. 25209-A.

2. That title to Gooseberry Island has been held by my family since September of 1955, when my grandfather, Sture Nelson, a/k/a N. Sture Nelson, acquired it from Fields Point Manufacturing Corporation. My grandfather owned Gooseberry Island until he conveyed it to my parents, Robert James Nelson and Betsy A. Nelson in February of 1982; and my parents owned Gooseberry Island from that time until they conveyed it to me in August of 1992, from which time to the present I have owned Gooseberry Island.

3. That from 1955 to the present, members of my family and I have regularly used the dirt way now known as Punkhorn Point Road to the shore adjacent to Gooseberry Island to access Gooseberry Island, where we would camp, fish or hunt. I have been personally using said way to access Gooseberry Island from the mid-1960's to the present. Said way has also been commonly referred to as the right of way leading from the public highway to Gooseberry Island. Portions of said right of way are shown as a 33' wide "Right of Way" on a plan of land prepared for Mary A. Bowman and recorded with the Barnstable County Registry of Deeds in Plan Book 72, Page 49; and a plan of land prepared for Herbert Nelson and my said grandfather recorded with said Registry of Deeds in Plan Book 74, Page 117.

4. That for most of my adult life, I have driven to the end of said right of way to the shore across from Gooseberry Island, parked my automobile on the side of the right of way and rowed my boat over to Gooseberry Island. For many years during my family's and my ownership of Gooseberry Island, I stored a rowboat or canoe on the shore at the end of the right of way, but more recently, I usually bring an inflatable with me to cross the narrow waterway between the end of the right of way and Gooseberry Island.

5. That no one has challenged my rights to utilize said right of way to access Gooseberry Island and, to my knowledge, no one ever challenged by said parents' or grandfather's rights to use said right of way to access Gooseberry Island.

SUBSCRIBED AND SWORN TO under the pains and penalties of perjury this 12th day of September, 2011.

_____
Robert J. Nelson, Jr.

## COMMONWEALTH OF MASSACHUSETTS

Barnstable, ss.

On this 12th day of September, 2011, before me, the undersigned notary public, personally appeared Robert J. Nelson, Jr., proved to me through satisfactory evidence of identification, which was *Mass Driver's License*, to be the person whose name is signed on the preceding or attached document, and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of his knowledge and belief.



JOHN J. ROCHE
NOTARY PUBLIC
COMMONWEALTH OF MASSACHUSETTS
MY COMMISSION EXPIRES MAY 23, 2014

_____, Notary Public

My Commission Expires: _____

EXHIBIT "C"

| From: | George Baker |
|---|---|
| Sent: | Monday, August 12, 2013 2:30 PM |
| To: | Mary Ann Romero |
| Cc: | Joel Clifford |
| Attachments: | 20130812142548212.pdf |

Mary Ann,

I have meet with the principles of the proposed residential occupancy on Gooseberry Island. As noted in the attached correspondence they will agree as a condition of a zoning wavier to install a residential fire sprinkler system. Do to the fact that they are taking this action I am not opposed to a waiver of 174-32 or other zoning requirements that have to do with road access.

Please communicate this information to the Zoning Board of Appeals.

Thank you.

George W. Baker
Fire Chief

Gooseberry Island Trust
c/o Boudreau & Boudreau LLP
396 North Street
Hyannis, MA 02601

AUG 0 9 2013

August 8, 2013

George Baker, Chief
Mashpee Fire & Rescue Department
20 Frank Hicks Drive
Mashpee, MA 02649

Re: Gooseberry Island

Dear Chief Baker,

It is the intention of the Gooseberry Island Trust to reconstruct a single family house on Gooseberry Island. Gooseberry Island Trust will be seeking a variance under 174-32 (Fire protection) of the Zoning By-laws. Do to the property's unique status as a privately owned island constitutes a circumstance especially affecting this land but not affecting generally the zoning district in which it is located. A variance from the fire protection requirements is necessary because without it, no structure can be built, regardless of size. To meet the fire protection requirement, the trust proposes to install a residential sprinkler system which is the standard practice for houses constructed on other islands in New England

Sincerely

Robert Emrheluth, Trustee
Gooseberry Island Trust

EXHIBIT "D"



# Town of Mashpee

*16 Great Neck Road North*
*Mashpee, Massachusetts 02649*

## BOARD OF APPEALS

Decision for a Variance

RE:   John C. & Sandra S. Hessler  V-99-29          84 Punkhorn Point Road
                                                    Map 100 Block 5

A Petition was filed on March 11, 1999 by John C. and Sandra S. Hessler of
Newton, Massachusetts for a Variance from Section 174-32 of the Zoning By-laws
for permission to construct a new single-family home on an unpaved road on property
located in an R-3 zoning district at 84 Punkhorn Point Road (Map 100 Block 5) Mashpee,
MA.

Notice was duly given to abutters in accordance with Massachusetts General
Laws Chapter 40A.  Notice was given by publication in The Mashpee Enterprise, a
newspaper of general circulation in the Town of Mashpee, on April 13 and April 20,
1999, a copy of which is attached hereto and made a part hereof.

A Public Hearing was held on the Petition at the Mashpee Town Hall on
Wednesday, April 28, 1999, at 7:30 P.M. at which time the following members of the
Board of Appeals were present and acting throughout:  James E. Regan III, Robert G.
Nelson and Richard T. Guerrera.

This Decision is issued by the Mashpee Board of Appeals pursuant to the
provisions of Massachusetts General Law, Chapter 40A, Section 10 and the Town of
Mashpee Zoning By-laws.

Mr. John Slavinsky of Cape & Islands Engineering represented the applicants
who propose to remove the existing small cabin on the lot and build a new house. He
stated that the property line is 100 feet from a paved road and the proposed building will
be 250 feet from a paved road. Mr. Slavinsky stated that the applicants also propose to
construct a combination garage/shed that will measure 16 feet x 18 feet. The
Conservation Commission has approved the project.

Mr. Slavinsky stated that the existing cesspool will be removed and a
denitrification system for the five-bedroom house will be installed.

No comments were received from abutters.

## FINDINGS

### General Findings

1. the subject property is located at 84 Punkhorn Point Road and consists of 1.3 acres of land

### Variance Criteria

Section 10 of Chapter 40A requires that the permit granting authority determine that there are circumstances relating to the shape and topography which affect this lot and not the district in which it is located and that a literal enforcement of the By-laws would involve hardship to the petitioner.

### Specific Findings

1. that a literal enforcement of the By-laws would involve hardship to the petitioner.
2. that relief may be granted without detriment to the public good.
3. that relief may be granted without derogating from the intent or purpose of the By-laws.
4. that the subject property fronts on Popponessett Bay and is impacted by wetlands.
5. that the property from the westerly property line for a distance of 200 feet along the road shall be graded and widened to 16 feet.
6. that an NFPA 13-D sprinkler system shall be installed in the residence.
7. that the applicants have pre-existing rights because of the existing shed.
8. that the removal of the cesspool and installation of a denitrification system will be an improvement to the property.
9. that the lot coverage is only 5%.
10. pending confirmation that the Conservation Commission has approved the project.

In view of the foregoing, the Mashpee Board of Appeals found that the applicant met the criteria necessary for the granting of a Variance. Upon motion duly made and seconded, the Board of Appeals voted unanimously on April 28, 1999 to grant a Variance to allow the applicants to construct a new home on an unpaved road. The permit is conditioned upon compliance with plan entitled "Proposed Site & Topographic Plan Located in Mashpee – Mass., Prepared for John C. & Sandra S. Hessler, Scale: 1" = 20 FT., Plan No. 030399, Date: Mar.3, 1999, Cape & Islands Engineering".



TOWN OF MASHPEE

**PUBLIC**

**HEARING**

**NOTICE**

The Mashpee Board of Appeals will hold Public Hearings on Wednesday, April 28, 1999, at 7:30 P.M. at the Mashpee Town Hall, 16 Great Neck Road North, on the following: John C. & Sandra S. Hessler - Request a Variance from Section 174-33 of the Zoning By-laws for permission to construct a new single-family home on an unpaved road on property located in an R-3 zoning district at 84 Punkhorn Point Road (Map 100 Block 5) Mashpee, MA. John C. & Sandra S. Hessler - Request a Special Permit under Section 174-20 of the Zoning By-laws for permission to demolish an existing non-conforming dwelling and construct a new dwelling on property located in an R-3 zoning district at 84 Punkhorn Point Road (Map 100 Block 5) Mashpee, MA.

Debra Lee Quigley - Request a Special Permit under Section 174-17 of the Zoning By-laws for permission to remove an existing shed, convert an existing dwelling into a garage and construct a single-family home on property located in an R-3 zoning district at 384 Monomoscoy Road (Map 125 Block 20) Mashpee, MA.

Bruce H. A. Bernabeo, M. Urquhart - Request a Variance from Section 174-31 of the Zoning By-laws for permission to vary the sideline setback requirements to allow construction of an attached garage to property located in an R-3 zoning district at 130 Surf Drive (Map 102 Block 3-8) Mashpee, MA.

Robert W. & Natalie K. Schimidt - Request a Special Permit under Section 174-15.19 of the Zoning By-laws for permission to construct a pier, ramp and float on John Pond on property located in an R-3 zoning district at 27 Wheelhouse Lane (Map 120 Block 166) and 3 Waterline North Drive (Map 120 Block 171) Mashpee, MA. (Owner of record of 5 Waterline North Drive New Seabury Properties L L C.)

Michael J. & Jodi Carpenter - Request a Variance from Section 174-31 of the Zoning By-laws for permission to vary the sideline setback to allow for construction of an attached garage to property located in an R-3 zoning district at 31 Pierce Morton Drive (Map 2 Block 142) Mashpee, MA. Plans may be viewed prior to the Hearings in the office of the Town Clerk.

Per order of
MASHPEE BOARD OF APPEALS
Edward M. Gowen, Chairman

April 13, 20, 1999

BY:
MASHPEE BOARD OF APPEALS

IN FAVOR:   *James E. Regan III*
James E. Regan III

IN FAVOR:   *Robert G. Nelson*
Robert G. Nelson

IN FAVOR:   *R. T. Guerrera*
Richard T. Guerrera

This Decision has been duly filed on __May 3, 1999__ with the Town Clerk of Mashpee. Any appeal shall be made pursuant to Section 17 of the Massachusetts General Laws Chapter 40A within Twenty days after the date of said filing.

This Decision is effective when a Certified Copy is filed at the Registry of Deeds. A Certified Copy may be obtained from the Town Clerk after the expiration of the 20-day Appeal period. Special Permits shall lapse after two years and Variances and Appeals after one year unless substantial use or construction has commenced or applications for extensions have been filed prior to the expiration date.

99 MAY -3 PM 8:54
TOWN CLERK
TOWN OF MASHPEE

I HEREBY CERTIFY THAT NO NOTICE OF APPEAL
HAS BEEN RECEIVED BY THIS OFFICE DURING
THE TWENTY DAYS FOLLOWING RECEIPT AND
RECORDING OF NOTICE FROM THE APPEALS
BOARD OF APPROVAL OF THE ATTACHED
DOCUMENT.

TOWN CLERK

DATE OF CERTIFICATION

May 26, 1999

A TRUE COPY, ATTEST

TOWN CLERK OF MASHPEE, MA

BARNSTABLE REGISTRY OF DEEDS

EXHIBIT "D-1"

 *Town of Mashpee*

*16 Great Neck Road North*
*Mashpee, Massachusetts 02649*

## MASHPEE ZONING BOARD OF APPEALS

### Decision for a Variance

RE:  Punkhorn Point Realty LLC                    80 Punkhorn Point Road
                                                  Map 100 Parcel 4

**V-05-46**

A Petition was filed on March 18, 2005 for a Variance from Sections 174-31, 174-32 and 174-33 of the Zoning By-laws to seek relief from the lot frontage requirements, setback to the wetlands and from the fire protection by law requiring the said access roadway shall be constructed to a point no less than 150 feet from the furthest point of any building on the lot on property in order to build a new dwelling on property located in an R-3 zoning district at 80 Punkhorn Point Road (Map 100 Parcel 4) Mashpee, MA.

Notice was duly given to abutters in accordance with Massachusetts General Laws Chapter 40A. Notice was given by publication in The Mashpee Enterprise, a newspaper of general circulation on March 25, 2005 and April 1, 2005, a copy of which is attached hereto and made a part in the Town of Mashpee, on hereof.

A Public Hearing was held on the Petition at the Mashpee Town Hall on Wednesday, May 25, 2005, at which time the following members of the Zoning Board of Appeals were present and acting throughout: Robert Nelson, Zella Elizenberry, Evano Cunha, Jonathan Furbush and Eric Dublirer.

The Mashpee Zoning Board of Appeals issues this Decision pursuant to the provisions of Massachusetts General Laws Chapter 40A Section 10 and the Town of Mashpee Zoning By-laws.

David Sanicki of Cape & Islands Engineering represents the applicant at this hearing. They are seeking to raze and replace the current dwelling on this property. They have also requested relief from the wetlands by law and the fire department bylaw that requires the farthest point of the structure be no more than 150 feet from the pavement in the street for access by the fire trucks. The Board reviews the plans and asks about moving

Mashpee Zoning
Board of Appeals                Punkhorn Point Realty LLC
2                                     V-05-46

street for access by the fire trucks. The Board reviews the plans and asks about moving the house in a different direction. Mr. Sanicki informs them that moving it any other way would put the property in the flood zone which would require different construction and materials. The applicant is not seeking to push the house any further away from the fire access area than what currently exists now. The Board has no problem with that since it is not making it any more detrimental than what is there now. The Board moves to grant the following:

- ✓ A 43.8 frontage variance
- ✓ 17 foot variance to the wetlands
- ✓ a 130 foot variance to the fire protection by law setback

## GENERAL FINDINGS

1. that the subject property is located at 80 Punkhorn Point Road and contains 1.0 acres.

## SPECIFIC FINDINGS

The Board determined that:

1. a literal enforcement of the By-laws would involve substantial hardship to the petitioner.

2. Desirable relief may be granted without substantial detriment to the public good and without nullifying or substantially derogating from the intent or purpose of the by-law.

3. the proposed dwelling will not be any further from the pavement in the street than currently exists now.

In view of the foregoing, the Mashpee Zoning Board of Appeals found that the Petitioner met the criteria necessary for the granting of the following:

- ✓ 43.80 foot frontage variance
- ✓ 17 foot variance to the wetlands
- ✓ 130 foot variance to the fire protection by law setback

This is conditioned upon compliance with plans from Cape & Islands Engineering, dated January12, 2005, revised April 13, 2005 and revised May 10, 2005.

# MASHPEE ZONING BOARD OF APPEALS
## Punkhorn Point Realty LLC
## V-05-46

IN FAVOR: *Robert A. Nelson*          TO DENY: _____

IN FAVOR: *Zella Elizaberry*          TO DENY: _____

IN FAVOR: *Gene L. Cushue*          TO DENY: _____

IN FAVOR: _____          TO DENY: _____

IN FAVOR: _____          TO DENY: _____

JUN 0 6 2005

This Decision has been duly filed on _____ with the Town Clerk of Mashpee. Any appeals shall be made pursuant to Section 17 of the Massachusetts General Laws Chapter 40A within twenty days after the date of said filing.

This Decision is effective when a Certified Copy is filed at the Registry of Deeds. A Certified Copy may be obtained from the Town Clerk after the expiration of the 20-day Appeal period. Special Permits shall lapse after two years and Variances and Appeals after one year, unless substantial use or construction has commenced or applications for extensions have been filed prior to the expiration date.

**TOWN**

**MASHPEE**
**OF**

**PUBLIC HEARING NOTICE**
**ZONING BOARD OF APPEALS**
The Mashpee Zoning Board of Appeals will hold Public Hearing on Tuesday, April 12, 2005, at 7:00 P.M. (Upstairs, Conference Room#1) at the Mashpee Town Hall, 16 Great Neck Road North, on the following:

Mary and Gerald O'Connor: Request a Special Permit from Section 174-45.2 of the zoning By-laws in order to build an accessory apartment in his existing basement on property located at 91 Shields Road. (Map 68½ Parcel 71) Mashpee MA.

Jeffrey and Susan Clancy: Request a Variance from Section 174-31 of the zoning by-laws, in order to deem this lot buildable due to contiguous ownership on property located in an R-5 zoning district at 146 Jersey Circle (Map71 Parcel 4) Mashpee MA.

Matthew and Holly Brandon: Request a Variance from Section 174-31 of the zoning bylaws to seek relief from the setback requirements in order to build a 18X20 garage on property located in a R-5 zoning district at 96 Park Place Way (Map 37 Parcel 187) Mashpee MA.

Chilton Development Co. Inc: Requests a Special Permit under Sections 174-17 and 174-20 of the zoning by-laws in order to demolish a pre-existing non-conforming structure and reconstruct a new dwelling on property located in an R-5 district at 169 Waterway (Map 111 Parcel 89) Mashpee MA.

Kenneth and Susan Konkewitz: Request a Special Permit from Section 174-17 of the zoning by-law in order to expand and alter a pre-existing non-conforming structure on property located in an R-3 zoning district at 95 Whippoorwill Circle (Map 125 Parcel 152) Mashpee MA.

John Reardon: Request a Special Permit from Sections 174-17 and 174-20 of the zoning by-laws in order to alter and change a pre-existing non-conforming structure on property located in an R-3 zoning district at 55 Amy Brown Road (Map 109-Parcel 26) Mashpee MA.

George Hickerson: Request a Variance from Section 174-31 of the by-laws to seek relief from the landscape requirements while applicant seeks to have two previously merged lots on property located in an R-5 zoning district at 4 Florence Avenue (Map 1-Parcel 19-Lot 5) Mashpee MA.

George Hickerson: Request a Variance from Section 174-31 of the zoning by-laws to seek relief from the landscape requirements while applicant seeks to have two previously merged lots on property located in an R-5 zoning district at 4 Florence Avenue.

Marc Gernsen: Request a Special Permit from Sections 174-17 and 174-20 of the zoning by-laws in order to demolish and reconstruct a pre-existing non-conforming structure on property located in an R-3 zoning district at 16 Rock Island Road (Map 128-Parcel 22) Mashpee MA.

Pine Coast Builders: Appeal a Variance from Section 174-31 of the zoning by-laws to seek relief from the setback requirements in order to construct a single family dwelling on property located in an R-3 zoning district at 18 Rock Island Road (Map 128-Parcel 22) Mashpee MA.

Mark Tatro: Request a Variance from Section 174-31 of the zoning bylaws to seek relief from the setback requirements and turn into a sunroom on property located in an R-5 zoning district at 26 Rachelle Court (Map-Parcel 141) Mashpee MA.

Cotuit Landing Realty LLC: Request a Special Permit under Sections 174-17 and 174-20 of the zoning by-laws in order to demolish and reconstruct a new dwelling on property located in an R-3 zoning district at 60 Punkhorn Road (Map100-Parcel4)

Punkhorn Realty LLC: Request a Variance from Sections 174-31, 174-33, 174-33.1 also zoning by-laws to seek relief from the lot coverage requirements, setback to the wetlands and from the fire protection by-law requiring the road access be no more than 150 feet from the furthest point of any building on the lot on property located in an R-3 zoning district at 80 Punkhorn Road (Map 100-Parcel 4) Mashpee MA.

Plans may be viewed prior to the hearings in the office of the Town Clerk.

Robert Nelson, Chairman Mashpee Zoning Board of Appeals

March 30, 2005
April 1, 2005

222
C of I any.

I HEREBY CERTIFY THAT NO NOTICE OF
APPEAL HAS BEEN RECEIVED BY THIS OFFICE
DURING THE TWENTY DAYS FOLLOWING
RECEIPT AND CERTIFICATION OF NOTICE FROM
THE APPEALS BOARD OF APPROVAL OF THE
ATTACHED PLAN.

TOWN CLERK

DATE OF CERTIFICATION

BARNSTABLE REGISTRY OF DEEDS



PLAN OF GOOSEBERRY ISLAND
MASHPEE, MASSACHUSETTS
PREPARED FOR
GOOSEBERRY ISLAND TRUST

GOOSEBERRY ISLAND

POPPONESSET BAY



# EXHIBIT 10


# MASHPEE ZONING BOARD OF APPEALS
## DECISION FOR A VARIANCE
### V-2013-44

Robert D. Emmeluth, Trustee of            Certificate of Title # 195170
Gooseberry Island Trust                   Plan#: 25209-A
c/o Boudreau & Boudreau
0 Gooseberry Island
Map 100 Parcel 6-0-R

       A Petition was filed on August 29, 2013 requesting a Variance from Article V §174-12 of the Zoning By-laws requiring frontage on a street and direct access to a paved town, county or state road or street as defined in said Section in order to construct a single family residence on property located in an R-3 Zoning District at 0 Gooseberry Island, (Map 100, Parcel 6-0-R), Mashpee, MA.

       Notice was duly given to abutters in accordance with Massachusetts General Laws Chapter 40A. Notice was given by publication in The Mashpee Enterprise, a newspaper of general circulation in the Town of Mashpee, on September 20, 2013 and September 27, 2013 a copy of which is attached hereto and made a part hereof.

       On October 9, 2013, Public Hearings were held on the Petition at the Mashpee Town Hall at which time the following members of the Board were present and acting throughout: Chairman, Jonathan D. Furbush, Vice Chairman, William A. Blaisdell, Board Members, James Reiffarth and Richard Jodka, and Associate Member, Domingo K. DeBarros.

       The Mashpee Zoning Board of Appeals issues this Decision pursuant to the provisions of Massachusetts General Laws Chapter 40A §9 and the Town of Mashpee Zoning By-laws.

       Attorney Kevin Kirrane representing the Petitioner, Gooseberry Island Trust in connection with the application for variance relief. Kevin handed the Board an outline of his remarks relative to the application including photographs of the actual Island taken from various locations.

       Mr. Kirrane stated in his outline, Exhibit A depicts a copy of the land court decree plan dating back to 1954 which shows a structure situated in the middle of the Island. He also included Exhibit B of an Affidavit of Robert J. Nelson, Jr. who owned the property for more than 50 years and indicated the use of the property and how it was accessed.

1

Exhibit C of the outline is an email from former Fire Chief George W. Baker, dated August 12, 2013 stating he does not object to the construction of one single-family residential structure on the lot provided upon submitting a condition relative to the installation of sprinklers within the particular dwelling. Mr. Kirrane also attached Exhibits D and D-1, Variance Decisions issued by the Zoning Board relative to properties located at 80 and 84 Punkhorn Point Road that were granted similar relief.

Mr. Kirrane stated the applicant is seeking relief from the requirements of frontage The Island has existed before the adoption of zoning in the Town and before the adoption of any frontage requirements pursuant to zoning by-laws in the Town. The Island is situated in a residentially zoned area and in the past was the site of small cottage or camp that was used by the previous owners and current owners. Although no structure exists today, it was used in the past years for fishing, hunting and other recreational activity.

Mr. Kirrane stated that variances are difficult to obtain and there is certain criteria the Board must consider. The first relates to soil conditions, shape or typography of the land or structures which especially effect this particular lot and not generally affecting the Zoning District that this lot or parcel is located. In addition, the applicant should be able to demonstrate the existence of a hard-ship, and finally the relief be granted without substantial detriment to the public good or without nullifying or substantially derogating from the intent of the by-law.

Mr. Kirrane stated the lot itself is in excess of 3 acres and the proposed dwelling to be located on the lot would conform in all other respects to Zoning requirements and obviously there would be a need for the applicant to submit plans to Conservation and Board of Health when the time arises to propose a single-family dwelling on the lot. He also mentioned the submitted plan shows the approximate location of the dwelling and where it would be situated.

## Conservation Comments:

October 4, 2013 emailed received from Andrew McManus, Conservation Agent; "This will require a filing with the Conservation Department- Certified delineations of flood zone(s), coastal banks, salt marsh, bordering vegetated wetlands and/or any rare species habitat(s) must be supplied to the Conservation Commission for any and all disturbances within 100 feet of the aforementioned wetland resource areas- ref. Chapter 172-1 of the Mashpee wetland by-law & 310 CMR 10.00- State Wetlands Protection Act."

Mr. Furbush stated the plot plan depicts the setback from the wetlands to 100 feet on the left side and does not show the distance between the proposed house and wetlands. The required setback is 150 feet. The setback from the house and wetlands is 50 feet. He also stated the plan shows the flood zone as A11 which means the first floor of the dwelling would require to be 11 feet above water. He stated that he would not entertain any motion until he received definitive answers from other Boards.

Mr. Furbush stated there are specific questions to be addressed such as emergency access and disturbance of the wetlands. He is very concerned if three years from now someone has a medical emergency. He asked Mr. Thomas Rullo, Acting Fire Chief who was present at the meeting what the time-line the State allows to arrive at a particular house and the guideline.

**Fire Department Comments**:

August 12, 2013 email received from Fire Chief Baker stating; "I have met with the principles of the proposed residential occupancy on Gooseberry Island. As noted in the attached correspondence they will agree as a condition of a zoning wavier to install a residential fire sprinkler system. Due to the fact that they are taking this action I am not opposed to a waiver of 174-32 or other zoning requirements that have to do with road access. Please communicate this information to the Zoning Board of Appeals."

Thomas Rullo, Acting Fire Chief, addressed the Board to comment and answer any specific safety questions. He stated the only access to the Island is by boat and there would be a delay because there is no direct access. He stated there is an NFPA guideline, but Chief Baker had a guideline that he tried to uphold for over 20 years and that is a 6-7 minute mark, and would not be able to meet this time. Under normal circumstances, it's going to be delayed. Under adverse weather conditions, he was not sure he could arrive at all. He stated that former Fire Chief Baker had asked or was rendering an answer to the question of the building of the house and does not pertain to the access. He stated that Fire Chief Baker only addressed the house and not access. He stated that the sprinkler system is not designed to put out a fire. A sprinkler system is designed to contain the fire so the Fire Department has time to respond to a structure and put the fire out. The sprinkler system is designed to give the occupants more time to exit the home safely. This is for any structure whether commercial or residential.

Mr. Rullo stated the only access to the Island would be by boat from the Mashpee Neck dock location. He stated the boat is stored at the main fire station off Route 151.

**Board of Health Comments**:

October 9, 2013 emailed received from Glen Harrington, Mashpee Health Agent; "The October 4, 2013 plan depicts a septic system that is 100' from wetland but it does not meet the BOH 150' setback requirement for a coastal bank. A potable well must be proven before a building permit is issued. The BOH well setback requirement is 150'. This will be treated as new construction as no septic permits exist or evidence of previous occupied dwellings on the Island exist in BOH records".

**Harbormaster Comments**:

October 7, 2013 emailed received from Stephen Mone, Harbormaster stating; he wanted to know how the occupants would access the island, a dock on island, a dock on mainland, or bridge. He also stated the Tribe has a working shellfish grant around the island that may restrict access.

**Public Comments:**

Vice Chairman, Mr. Blaisdell read letters submitted to the Board by abutters that reside at 70 Punkhorn Point Road, 77 Punkhorn Point Road, 79 Punkhorn Point Road, 85 Punkhorn Point Road and 89 Punkhorn Point Road that were in favor of the proposed project.

Several abutters and Representatives of the Mashpee Wampanoag Tribe were present and addressed the Board and spoke in opposition. Jessie (Little Doe) Baird, Vice Chairman of the Mashpee Wampanoag Tribe stated her concerns the applicant had no regard for conditions of the Island or the shellfish grant. Attorney Charles Savon, representing his client that resides at 84 Punkhorn Point Road opposed stating this variance is a "self-imposed" hardship and does not qualify under case law as a hardship and inconsistent with the bylaw of a lot fronting a street. Tribal Chairman, Cedric Cromwell approached the Board stating he is strongly against the proposal besides safety and health is environment concerns for Popponesset Bay. John Weltman, of 80 Punkhorn Point Road spoke in opposition regarding safety issues. George Green, Assistant Director of the Natural Resource Department for the Tribe is opposed to the project and described the detail of the shellfish grant and hope to reach the 90% TMDL benchmark lowering sewer costs for the Town.

**General Findings:**

Gooseberry Island consists of 3.9 acres.

4

**Specific Criteria:**

**§174-12    Location of Building on Lots; Street Layout:**
No building shall be erected except on a lot fronting on a street, and there shall be not more than one (1) principle building on any residential lot, except as allowed under this chapter. For the purpose of adequate access to a parcel of land proposed for subdivision or division, there shall be required direct access from the parcel or lot to a paved town, county or state road or a street for which a road covenant has been released by the Planning Board or a street having a right-of-way layout and construction meeting at least the minimum layout width, pavement, drainage and other street requirements of the Mashpee Subdivision Regulations and Planning Board for subdivision streets.

Mr. Furbush concluded stating the several concerns with this project were medical emergencies, public safety, the question of hardship and the Tribe's comments on the effect of the oyster beds and septic system.

The Board, upon review of the testimony and evidence, determined that the proposed Variance would not advance the Town's interest in maintaining the public safety in further grant of Variance would in fact derogate from the underline purpose and intent of the Zoning By-laws.

In view of the foregoing, the Board made a motion on October 9, 2013 at the Public Hearings of the Zoning Board of Appeals and voted as follows: Mr. Jonathan D. Furbush, denied, Mr. William A. Blaisdell, denied, Mr. James Reiffarth, denied, Mr. Richard Jodka, in favor, Mr. Domingo K. DeBarros, denied, the Petitioner, Robert D. Emmeluth, Trustee, Gooseberry Island Trust request for a Variance from Article V §174-12 of the Zoning By-laws requiring frontage on a street and direct access to a paved town, county or state road or street as defined in said Section in order to construct a single family residence on property located in an R-3 Zoning District at 0 Gooseberry Island, (Map 100, Parcel 6-0-R), Mashpee, MA. Referencing plot plan from BSS Design Engineering and Surveying, of Gooseberry Island, Mashpee, MA prepared for Gooseberry Island Trust dated October 4, 2013.

MASHPEE ZONING BOARD OF APPEALS
Robert D. Emmeluth, Trustee
0 Gooseberry Island, (Map 100 Parcel 6-0-R)
Mashpee, MA  02649
V-2013-44

IN FAVOR: _____    TO DENY: _____
                                       Jonathan Furbush

IN FAVOR: WAB 10-15-13    TO DENY: W a Blaisdell
                                       William A. Blaisdell

IN FAVOR: _____    TO DENY: _____
                                       James Reiffarth

IN FAVOR: _____    TO DENY: _____
        Richard Jodka

IN FAVOR: _____    TO DENY: _____
                                       Domingo K. DeBarros

This Decision has been duly filed on October 22, 2013
with the Town Clerk of Mashpee. Any Appeals shall be
made pursuant to Section 17 of the Massachusetts General
Laws Chapter 40A within Twenty days after the date of
said filing.

This Decision is effective when a Certified Copy is filed at
the Barnstable County Registry of Deeds.  A Certified
Copy may be obtained from the Town Clerk the next
business day after the expiration of the 20-day Appeal
phase, which lasts through November 11, 2013

Special Permits shall lapse two years after date of grant.
Appeals shall lapse one year after date of grant.  If the
rights authorized by a Variance are not exercised within
one year of date of grant of such Variance, such rights shall
lapse unless: (1) substantial use or construction has
commenced, or (2) a Petition for a six-month extension has
been filed prior to the expiration date, or (3) the property
that is the subject of the Variance has been conveyed in
reliance on said Variance prior to the expiration date of
such one year period.

TOWN OF
MASHPEE
MASHPEE ZONING BOARD OF AP-
PEALS
PUBLIC HEARINGS NOTICE
OCTOBER 9, 2013
The Mashpee Zoning Board of Ap-
peals will hold Public Hearings on
Wednesday,
October 9, 2013, at 6:00 p.m. (Waquoit
Meeting Room) at the Mashpee Town
Hall,
16 Great Neck Road North, on the
following:
NEW HEARINGS
Robert D. Emmeluth, Trustee: Requests a Variance
from Article V, §174-12 of the Zoning Bylaws requiring
frontage on a street and direct access to a paved town,
county or state road at street as defined in said Section
in order to construct a single family residence on property
located in the R-5 Zoning District at 0 Gooseberry Island
(Map 100, Parcel 6-0-R), Mashpee, MA.
Robert D. Emmeluth, Trustee: Requests a Variance
from Article V, §174-31 of the Zoning Bylaws relating to a
150 of frontage on a street in order to construct a single
family residence on property located in an R-5 Zoning
District at 0 Gooseberry Island (Map 100 Parcel 6-0-R),
Mashpee, MA.
Robert D. Emmeluth, Trustee: Requests a Variance
from Article VII, §174-42 of the Zoning Bylaws relating to
Site Plan Approval concerning access as defined in
said Section in order to allow for the construction of a single
family residence (electrical) located in the R-5 Zoning
District at 0 Gooseberry Island, (Map 100, Parcel 6-0-R),
Mashpee, MA.
TCB Mashpee Village LP: Request a modification to
the 1974 Special Permit under §174-24(C) 8(a) (3) of the
Zoning Bylaws and M.G.L. Chapter 40A (6) to allow for
construction of a single additional accessory building on
property located in an R-5 Zoning District at One Wampa-
noag Drive, (Map 68 Parcel 1-0-R), Mashpee, MA.
Yelena & Lazar Kaufman: Request a Variance under Ar-
ticle V §174-31 (Land and Space Requirements) of the Zoning
Bylaws to vary the rear and side setback requirements
to allow for construction of a deck on property located
in an R-5 Zoning District at 119 Wildwood Drive (Map 40 Parcel
80), Mashpee, MA.
Plans may be reviewed prior to the hearings in the ZBA
office and the Town Clerk's office.
Per Order of:
Jonathan D. Furbush, Chairman,
Mashpee Zoning Board of Appeals
September 20, 27, 2013

TOWN CLERK
OCT 22 2013
RECEIVED BY

6



Town of Mashpee

16 Great Neck Road North
Mashpee, Massachusetts 02649

## MASHPEE ZONING BOARD OF APPEALS
## DECISION FOR A VARIANCE
## V-2013-45

Robert D. Emmeluth, Trustee of                    Certificate of Title # 195170
Gooseberry Island Trust                           Plan#: 25209-A
c/o Boudreau & Boudreau
0 Gooseberry Island
Map 100 Parcel 6-0-R

A Petition was filed on August 29, 2013 requesting a Variance from Article V §174-31 of the Zoning By-laws requiring a 150' of frontage on a street in order to construct a single family residence on property located in an R-3 Zoning District at 0 Gooseberry Island, (Map 100, Parcel 6-0-R), Mashpee, MA.

Notice was duly given to abutters in accordance with Massachusetts General Laws Chapter 40A. Notice was given by publication in The Mashpee Enterprise, a newspaper of general circulation in the Town of Mashpee, on September 20, 2013 and September 27, 2013 a copy of which is attached hereto and made a part hereof.

On October 9, 2013, Public Hearings were held on the Petition at the Mashpee Town Hall at which time the following members of the Board were present and acting throughout: Chairman, Jonathan D. Furbush, Vice Chairman, William A. Blaisdell, Board Members, James Reiffarth and Richard Jodka, and Associate Member, Domingo K. DeBarros.

The Mashpee Zoning Board of Appeals issues this Decision pursuant to the provisions of Massachusetts General Laws Chapter 40A §9 and the Town of Mashpee Zoning By-laws.

Attorney Kevin Kirrane representing the Petitioner, Gooseberry Island Trust in connection with the application for variance relief. Kevin handed the Board an outline of his remarks relative to the application including photographs of the actual Island taken from various locations.

Mr. Kirrane stated in his outline, Exhibit A depicts a copy of the land court decree plan dating back to 1954 which shows a structure situated in the middle of the Island. He also included Exhibit B of an Affidavit of Robert J. Nelson, Jr. who owned the property for more than 50 years and indicated the use of the property and how it was accessed.

Exhibit C of the outline is an email from former Fire Chief George W. Baker, dated August 12, 2013 stating he does not object to the construction of one single-family residential structure on the lot provided upon submitting a condition relative to the installation of sprinklers within the particular dwelling. Mr. Kirrane also attached Exhibits D and D-1, Variance Decisions issued by the Zoning Board relative to properties located at 80 and 84 Punkhorn Point Road that were granted similar relief.

Mr. Kirrane stated the applicant is seeking relief from the requirements of frontage The Island has existed before the adoption of zoning in the Town and before the adoption of any frontage requirements pursuant to zoning by-laws in the Town. The Island is situated in a residentially zoned area and in the past was the site of small cottage or camp that was used by the previous owners and current owners. Although no structure exists today, it was used in the past years for fishing, hunting and other recreational activity.

Mr. Kirrane stated that variances are difficult to obtain and there is certain criteria the Board must consider. The first relates to soil conditions, shape or typography of the land or structures which especially effect this particular lot and not generally affecting the Zoning District that this lot or parcel is located. In addition, the applicant should be able to demonstrate the existence of a hard-ship, and finally the relief be granted without substantial detriment to the public good or without nullifying or substantially derogating from the intent of the by-law.

Mr. Kirrane stated the lot itself is in excess of 3 acres and the proposed dwelling to be located on the lot would conform in all other respects to Zoning requirements and obviously there would be a need for the applicant to submit plans to Conservation, and Board of Health when the time arises to propose a single-family dwelling on the lot. He also mentioned the submitted plan shows the approximate location of the dwelling and where it would be situated.

**Conservation Comments:**

October 4, 2013 emailed received from Andrew McManus, Conservation Agent; "This will require a filing with the Conservation Department- Certified delineations of flood zone(s), coastal banks, salt marsh, bordering vegetated wetlands and/or any rare species habitat(s) must be supplied to the Conservation Commission for any and all disturbances within 100 feet of the aforementioned wetland resource areas- ref. Chapter 172-1 of the Mashpee wetland by-law & 310 CMR 10.00- State Wetlands Protection Act."

2

Mr. Furbush stated the plot plan depicts the setback from the wetlands to 100 feet on the left side and does not show the distance between the proposed house and wetlands. The required setback is 150 feet. The setback from the house and wetlands is 50 feet. He also stated the plan shows the flood zone as A11 which means the first floor of the dwelling would require to be 11 feet above water. He stated that he would not entertain any motion until he received definitive answers from other Boards.

Mr. Furbush stated there are specific questions to be addressed such as emergency access and disturbance of the wetlands. He is very concerned if three years from now someone has a medical emergency. He asked Mr. Thomas Rullo, Acting Fire Chief who was present at the meeting what the time-line the State allows to arrive at a particular house and the guideline.

**Fire Department Comments:**

August 12, 2013 email received from Fire Chief Baker stating; "I have met with the principles of the proposed residential occupancy on Gooseberry Island. As noted in the attached correspondence they will agree as a condition of a zoning wavier to install a residential fire sprinkler system. Due to the fact that they are taking this action I am not opposed to a waiver of 174-32 or other zoning requirements that have to do with road access. Please communicate this information to the Zoning Board of Appeals."

Thomas Rullo, Acting Fire Chief, addressed the Board to comment and answer any specific safety questions. He stated the only access to the Island is by boat and there would be a delay because there is no direct access. He stated there is an NFPA guideline, but Chief Baker had a guideline that he tried to uphold for over 20 years and that is a 6-7 minute mark, and would not be able to meet this time. Under normal circumstances, it's going to be delayed. Under adverse weather conditions, he was not sure he could arrive at all. He stated that former Fire Chief Baker had asked or was rendering an answer to the question of the building of the house and does not pertain to the access. He stated that Fire Chief Baker only addressed the house and not access. He stated that the sprinkler system is not designed to put out a fire. A sprinkler system is designed to contain the fire so the Fire Department has time to respond to a structure and put the fire out. The sprinkler system is designed to give the occupants more time to exit the home safely. This is for any structure whether commercial or residential.

Mr. Rullo stated the only access to the Island would be by boat from the Mashpee Neck dock location. He stated the boat is stored at the main fire station off Route 151.

**Board of Health Comments**:

October 9, 2013 emailed received from Glen Harrington, Mashpee Health Agent; "The October 4, 2013 plan depicts a septic system that is 100' from wetland but it does not meet the BOH 150' setback requirement for a coastal bank. A potable well must be proven before a building permit is issued. The BOH well setback requirement is 150'. This will be treated as new construction as no septic permits exist or evidence of previous occupied dwellings on the Island exist in BOH records".

**Harbormaster Comments**:

October 7, 2013 emailed received from Stephen Mone, Harbormaster stating; he wanted to know how the occupants would access the island, a dock on island, a dock on mainland, or bridge. He also stated the Tribe has a working shellfish grant around the island that may restrict access.

**Public Comments**:

Vice Chairman, Mr. Blaisdell read letters submitted to the Board by abutters that reside at 70 Punkhorn Point Road, 77 Punkhorn Point Road, 79 Punkhorn Point Road, 85 Punkhorn Point Road and 89 Punkhorn Point Road that were in favor of the proposed project.

Several abutters and Representatives of the Mashpee Wampanoag Tribe were present and addressed the Board and spoke in opposition. Jessie (Little Doe) Baird, Vice Chairman of the Mashpee Wampanoag Tribe stated her concerns the applicant had no regard for conditions of the Island or the shellfish grant. Attorney Charles Savon, representing his client that resides at 84 Punkhorn Point Road opposed stating this variance is a "self-imposed" hardship and does not qualify under case law as a hardship and inconsistent with the bylaw of a lot fronting a street. Tribal Chairman, Cedric Cromwell approached the Board stating he is strongly against the proposal besides safety and health is environment concerns for Popponesset Bay. John Weltman, of 80 Punkhorn Point Road spoke in opposition regarding safety issues. George Green, Assistant Director of the Natural Resource Department for the Tribe is opposed to the project and described the detail of the shellfish grant and hope to reach the 90% TMDL benchmark lowering sewer costs for the Town.

**General Findings**:

Gooseberry Island consists of 3.9 acres.

4

**Specific Criteria:**

§174-31. Land Space Requirements Table.
History: Amended 5-8-1989, STM, Article 4, approved by Attorney General 8-10-1989.
History: Amended 10-7-1991 ATM, Articles 13 and 24, approved by Attorney General 2-3-1992.
§174-31. Land Space Requirements Table
History: Amended 5-8-1989, STM, Article 4, approved by Attorney General 8-10-1989.
History: Amended 10-7-1991 ATM, Articles 13 and 24, approved by Attorney General 2-3-1992.

### Town of Mashpee - Land Space Requirements Table [9,10]

| Zoning District | Minimum Lot Size[12] (square feet) | Minimum Lot Frontage[1,2,13] (feet) | Minimum Building Setback to Lot Lines [22] | | | Maximum Building Height[4,17,18,21] | | Maximum Lot Coverage[1,6] (percent) |
| | | | Front[3,5,6,19, 20,] (feet) | Rear[3,5, 19,23] (feet) | Side[3,5,19, 23] (feet) | (Stories) | (feet) | |
|---|---|---|---|---|---|---|---|---|
| Residence Districts | | | | | | | | |
| R-3 | 40,000 | 150 | 40 | 15 | 15 | 2 1/2 | 35 | 20[5] |
| R-5 | 80,000 | 150 | 40 | 25 | 25 | 2 1/2 | 35 | 20[5] |
| Commercial Districts | | | | | | | | |
| C-1 | 40,000 | 200 | 40[14] | 40[8] | 20[8] | 2 | 35 | 25[5] |
| C-2 | 40,000 | 200 | 75[14] | 20[5,8] | 20[8] | 2 | 35 | 20[5] |
| C-3[20] | 40,000 | 200 | 75 | 20 | 20 | 2 ½ | 35 | 20 |
| Industrial Districts | | | | | | | | |
| I-1 | 40,000 | 200 | 75[11,15] | 50 | 30[8] | 2 | 35 | 25 |

Land Space Requirements Table Footnotes
1 For lots where any part of the front lot line is on an arc of a curve with a radius of three hundred (300) feet
or less, lot frontage may be measured along a straight line connecting the points of intersection of the side
lot lines with the minimum building setback line applicable to the lot under this bylaw.
History: Amended 10-7-1996, ATM, Article 29, approved by Attorney General 12-9-1996.
2 Not less than the frontage requirements shall be maintained throughout the front yard depth, except as
provided for in Note 1 above.
3 On lots abutting streets or public ways on more than one (1) side, the front setback requirements shall apply
to each of the abutting street and public ways. In the case of undefined streets, the measurements shall be taken
from the center of the road and an additional twenty (20) feet shall be required.
History: Amended 10-2-2000 ATM, Article 33, approved by Attorney General 1-12-2001.

4 These height restrictions shall not apply to chimneys, water towers, skylights and other necessary features appurtenant to buildings which are usually carried above roofs and are not used for human occupancy nor to wireless or broadcasting towers and other like unenclosed structures, except that when any structure or portion of a structure is proposed to exceed forty (40) feet in height, construction shall require a Federal Aviation Administration (FAA) Determination of No Hazard or evidence of exemption for the determination process. Other than for those items excepted above, height shall be measured from the average original grade of the land adjacent to the foundation line of any proposed structure (prior to the clearance of the natural vegetation from said site) to any applicable point on a structure. Except for a traditional widow's walk of up to one hundred (100) square feet in area, roof decks will be permitted only if located directly on top of the first or second story of any building.
History: Amended 10-16-2006 ATM, Article 30, approved by Attorney General 2-13-2007.
5 See Article IX regarding motels, attached dwellings and apartments.
History: Amended 12-9-2002 STM, Article 11, approved by Attorney General 2-19-2003.
6 A dwelling need not be set back more than the average of the setbacks of dwellings on the lots adjacent to either side. If a vacant lot exists on one (1) side, it shall be considered as a dwelling set back the depth of the required front yard.
7 Except no requirement when the side of a building abuts another building.
8 Except fifty (50) feet when abutting a residential zone (except residentially zoned land which is a part of the same parcel on which the industrial or commercial use lies and which cannot be later separated or developed for residential use).
History: Amended 5-8-1989 ATM, Article 4, approved by Attorney General 8-10-1989.
9 Floodplain restrictions are set forth in Article XI.
10 All land space requirements shall apply to accessory uses.
11 Except that no building in any industrial district may be located within 150 feet of Routes 28 or 151.
History: Amended 5-5-2003 ATM, Article 26, approved by Attorney General 8-27-2003.
12 Any water or wetland as defined under MGL C. 131, §40, any existing or proposed street, any roadway right-of-way or easement twenty (20) feet or more in width or any overhead utility right-of-way or easement twenty (20) feet or more in width may not be counted toward minimum lot size requirements.
History: Amended 10-7-1991 ATM, Article 24, approved by Attorney General 2-3-1992.
13 Minimum lot frontage for lots fronting only on Routes 28 and 151 shall be six hundred (600) feet.
14 No building may be located within 75 feet of Routes 28 and 151, Great Neck Road South and North or Route 130 west of Great Neck Road (except within the Mashpee Center Overlay District) and, except for permitted signs and one (1) access driveway involving clearance of a path no more than forty (40) feet in width, any land within fifty (50) feet of said roads shall be left as a wooded buffer area in its natural state, except that said area may be reduced by the Planning Board as part of its decision on a special permit approved under §174-45.1 or §174-46. Where such area is not naturally wooded, it shall be suitably planted with sufficient trees and under story vegetation, of a type common in natural areas of Mashpee, to replicate a naturally wooded area and to constitute a visual barrier between the proposed development and the roadway. Under no circumstances will parking, retention ponds, or any other development involving natural vegetation be permitted within said area. Limited, appropriate tree surgery or similar limited maintenance required to protect the health of vegetation in this area may be allowed with the approval of the special permit authority which originally authorized the project which included said area or, if no special permit was required, with the approval of a majority of the Planning Board. In Commercial and Industrial Districts, any land within the side and rear lot lines shall have at a minimum a ten (10) foot vegetated buffer, either in its natural state or in accordance with a landscape plan approved by the Design Review Committee, with the recommendation made to the Zoning Board of Appeals or the Planning Board. Said buffer may be waived, as part of a special permit decision, where the special permit granting authority determines that such buffer would be inappropriate for the area and where there is a written agreement to said waiver by the abutting property owner. History: Amended 5-1-2000 ATM, Article 32, approved by Attorney General 8-7-2000.

History: Amended 10-2-2000 ATM, Article 33, approved by Attorney General 1-12-2001.

History: Amended 10-20-2003 ATM, Article 15, approved by Attorney General 11-14-2003.

History: Amended 10-16-2006 ATM, Article 28, approved by Attorney General 2-13-2007.

15 Where a lot in any industrial districts fronts on Routes 28, 151 or 130, except for permitted signs and one (1) access driveway involving clearance of a path no more than forty (40) feet in width, the first one hundred (100) feet of the front setback area shall be left wooded and in its natural state. Where such area is not naturally wooded, it shall be suitable landscaped with a sufficient number of trees or a type common in Mashpee to constitute a visual barrier between the proposed development and the roadway. Under no circumstances will parking, retention ponds or any other development involving clearance of natural vegetation be permitted within said area. Nothing herein is intended to prohibit appropriate tree surgery or similar maintenance of vegetation in this buffer area.

16 Any water or wetland, as defined under MGL C.131, §40, any existing or proposed street or any roadway, right-of-way or easement twenty (20) feet or more in width may not be counted toward lot size for the purpose of calculating maximum lot coverage. For lots in any cluster subdivision, maximum lot coverage shall be thirty (30) percent.

History: Added 10-7-1991 ATM, Article 24, approved by Attorney General 2-3-1992.

History: Amended 10-7-1996, ATM Article 28, approved by Attorney General 12-9-1996.

17 Except as otherwise allowed under §174-46, Open space incentive development.

History: Added 10-7-1991 ATM, Article 24, approved by Attorney General on 2-3-1992.

18 Maximum height within the Popponesset Overly District shall be thirty (30) feet, subject to the provisions of Footnote 4 of this table. Minimum lot size shall be 6000 square feet, minimum frontage sixty (60) feet, minimum building setbacks 25 feet front, 15 feet rear and 15 feet side and maximum of lot coverage twenty (20) percent.

History: Added 5-3-1993 ATM, Article 12, approved by Attorney General 7-19-1993.

History: Amended 5-6-1997, ATM, Article 46, approved by Attorney General 9-25-1997.

19 These setback requirements shall not apply to the following building projections provided they do not exceed the sizes specified, as measured from the foundation line along a line perpendicular to the nearest property line: chimney projecting no more than three (3) feet, house overhang projecting no more than two (2) feet, roof overhang projecting no more than three and one-half (3 1/2) feet, and open decks or platforms used for egress projecting no more than four (4) feet. These setback requirements shall also not apply to stairs required as a means of egress, basement bulkhead of the hatch door type or handicapped access ramps on private property used solely for the purpose of facilitating ingress or egress of a physically handicapped person, as defined in MGL C. 22, §13A.

History: Added 10-4-1993 ATM, Article 26, approved by Attorney General 10-18-1993.

20 Minimum front building setback within the Mashpee Overlay District shall be twenty (20) feet and maximum allowed building setback for the principal structure on a lot shall be forty (40) feet.
Except as required by §174-25.1.

History: Added 10-4-1999 ATM, Article 29, approved by Attorney General 1-11-2000.

History: Amended 10-7-2002 ATM, Article 22, approved by Attorney General 11-27-2002.

21 Except that hotels and motels (and not other uses) approved by the Planning Board under the provisions of §174-45 may be increased to three (3) stories and forty five (45) feet, if approved by the Board, provided that there is adequate access for Fire Department vehicles and equipment and that all Fire Protection Construction Documents required by 780 CMR Subsection 903.1.1 of the Massachusetts State Building Code, have been submitted to the Planning Board and Fire Department as part of the special permit application and the Board is satisfied that the standards of said Subsection will be met.

History: Amended 10-18-2004 ATM, Article 40, approved by Attorney General 12-16-2004

22 Minimum front building setback within the Mashpee Center Overlay District shall be twenty (20) feet and maximum allowed building setback for the principal structure on a lot shall be forty (40) feet.

History: Added 10-17-2005 ATM, Article 18, approved by Attorney General 3-7-2006

23 Minimum required setback from rear or side property lines shall be five (5) feet for sheds or similarly noninhabitable structures not exceeding 120 square feet in floor area or twelve (12) feet in height.

History: Added 10-17-2005 ATM, Article 13, approved by Attorney General 3-7-2006

Mr. Furbush concluded stating the several concerns with this project were medical emergencies, public safety, the question of hardship and the Tribe's comments on the effect of the oyster beds and septic system.

The Board, upon review of the testimony and evidence, determined that the proposed Variance would not advance the Town's interest in maintaining the public safety in further grant of Variance would in fact derogate from the underline purpose and intent of the Zoning By-laws.

In view of the foregoing, the Board made a motion on October 9, 2013 at the Public Hearings of the Zoning Board of Appeals and voted as follows: Mr. Jonathan D. Furbush, denied, Mr. William A. Blaisdell, denied, Mr. James Reiffarth, denied, Mr. Richard Jodka, in favor, Mr. Domingo K. DeBarros, denied, the Petitioner, Robert D. Emmeluth, Trustee, Gooseberry Island Trust request for a Variance from Article V §174-31 of the Zoning By-laws requiring a 150' of frontage on a street in order to construct a single family residence on property located in an R-3 Zoning District at 0 Gooseberry Island, (Map 100, Parcel 6-0-R), Mashpee, MA. Referencing plot plan from BSS Design Engineering and Surveying, of Gooseberry Island, Mashpee, MA prepared for Gooseberry Island Trust dated October 4, 2013.

MASHPEE ZONING BOARD OF APPEALS
Robert D. Emmeluth, Trustee
0 Gooseberry Island, (Map 100 Parcel 6-0-R)
Mashpee, MA  02649
V-2013-45

IN FAVOR: _____     TO DENY: _____
                                        Jonathan Furbush

IN FAVOR: _____     TO DENY: _____
                                        William A. Blaisdell

IN FAVOR: _____     TO DENY: _____
                                        James Reiffarth

IN FAVOR: _____     TO DENY: _____
                Richard Jodka

IN FAVOR: _____     TO DENY: _____
                                        Domingo X. DeBarros

This Decision has been duly filed on October 22, 2013 with the Town Clerk of Mashpee. Any Appeals shall be made pursuant to Section 17 of the Massachusetts General Laws Chapter 40A within Twenty days after the date of said filing.

This Decision is effective when a Certified Copy is filed at the Barnstable County Registry of Deeds.  A Certified Copy may be obtained from the Town Clerk the next business day after the expiration of the 20-day Appeal phase, which lasts through November 11, 2013 .

Special Permits shall lapse two years after date of grant. Appeals shall lapse one year after date of grant.  If the rights authorized by a Variance are not exercised within one year of date of grant of such Variance, such rights shall lapse unless: (1) substantial use or construction has commenced, or (2) a Petition for a six-month extension has been filed prior to the expiration date, or (3) the property that is the subject of the Variance has been conveyed in reliance on said Variance prior to the expiration date of such one year period.

9

TOWN
OF
MASHPEE
MASHPEE ZONING BOARD OF AP-
PEALS
PUBLIC HEARINGS NOTICE
OCTOBER 9, 2013
The Mashpee Zoning Board of Ap-
peals will hold Public Hearings on
Wednesday,
October 9, 2013, at 6:00 p.m. (Waquoit
Meeting Room) at the Mashpee Town
Hall,
16 Great Neck Road North, on the
following:
NEW HEARINGS
Robert D. Emmeluth, Trustee: Requests a Variance
from Article V §174-12 of the Zoning By-laws requiring
frontage on a street and direct access to a paved town,
county or state road or street as defined in said Section
in order to construct a single family residence on property
located in an R-3 Zoning District at 0 Gooseberry Island,
(Map 100, Parcel 6-0-R) Mashpee, MA.
Robert D. Emmeluth, Trustee: Requests a Variance
from Article V §174-31 of the Zoning By-laws requiring a
150' of frontage on a street in order to construct a single
family residence on property located in an R-3 Zoning
District at 0 Gooseberry Island, (Map 100, Parcel 6-0-R)
Mashpee, MA.

Robert D. Emmeluth, Trustee: Requests a Variance
from Article VII §174-24 of the Zoning By-laws requir-
ing Fire Department apparatus access as defined in
said Section in order for the construction of a single
family residence on property located in an R-3 Zoning
District at 0 Gooseberry Island, (Map 100, Parcel 6-0-R)
Mashpee, MA.
TCB Mashpee Village LP: Request a modification to
the 1974 Special Permit (under §174-24(C) 9 (a) (b) of the
Zoning By-laws and M.G.L. Chapter 40A §6 to allow for
construction of a single additional accessory building on
property located in an R-5 Zoning District at One Vampa-
noag Drive (Map 96 Parcel 1-0-R), Mashpee, MA.
Yelena & Lazar Kaufman: Request a Variance under Ar-
ticle V §174-51 (Land Space Requirements) of the Zoning
By-Laws to vary the rear and side yard setbacks in order
to allow for construction of a deck on property located in
an R-5 Zoning District at 79 Pond Circle (Map 64 Parcel
60), Mashpee, MA.
Plans may be viewed prior to the hearings in the ZBA
office and the Town Clerk's office.
Per Order of
_____, Chairman
Mashpee Zoning Board of Appeals
September 20, 27, 2013

TOWN CLERK
OCT 22 2013
RECEIVED



## MASHPEE ZONING BOARD OF APPEALS
## DECISION FOR A VARIANCE
## V-2013-46

Robert D. Emmeluth, Trustee of
Gooseberry Island Trust
c/o Boudreau & Boudreau
0 Gooseberry Island
Map 100 Parcel 6-0-R

Certificate of Title # 195170
Plan#: 25209-A

A Petition was filed on August 29, 2013 requesting a Variance from Article VII §174-32 of the Zoning By-laws requiring Fire Department apparatus access as defined in said Section to allow for the construction of a single family residence on property located in an R-3 Zoning District at 0 Gooseberry Island, (Map 100, Parcel 6-0-R), Mashpee, MA.

Notice was duly given to abutters in accordance with Massachusetts General Laws Chapter 40A. Notice was given by publication in The Mashpee Enterprise, a newspaper of general circulation in the Town of Mashpee, on September 20, 2013 and September 27, 2013 a copy of which is attached hereto and made a part hereof.

On October 9, 2013, Public Hearings were held on the Petition at the Mashpee Town Hall at which time the following members of the Board were present and acting throughout: Chairman, Jonathan D. Furbush, Vice Chairman, William A. Blaisdell, Board Members, James Reiffarth and Richard Jodka, and Associate Member, Domingo K. DeBarros.

The Mashpee Zoning Board of Appeals issues this Decision pursuant to the provisions of Massachusetts General Laws Chapter 40A §9 and the Town of Mashpee Zoning By-laws.

Attorney Kevin Kirrane representing the Petitioner, Gooseberry Island Trust in connection with the application for variance relief. Kevin handed the Board an outline of his remarks relative to the application including photographs of the actual Island taken from various locations.

Mr. Kirrane stated in his outline, Exhibit A depicts a copy of the land court decree plan dating back to 1954 which shows a structure situated in the middle of the Island. He also included Exhibit B of an Affidavit of Robert J. Nelson, Jr. who owned the property for more than 50 years and indicated the use of the property and how it was accessed.

Exhibit C of the outline is an email from former Fire Chief George W. Baker, dated August 12, 2013 stating he does not object to the construction of one single-family residential structure on the lot provided upon submitting a condition relative to the installation of sprinklers within the particular dwelling. Mr. Kirrane also attached Exhibits D and D-1, Variance Decisions issued by the Zoning Board relative to properties located at 80 and 84 Punkhorn Point Road that were granted similar relief.

Mr. Kirrane stated the applicant is seeking relief from the requirements of frontage The Island has existed before the adoption of zoning in the Town and before the adoption of any frontage requirements pursuant to zoning by-laws in the Town. The Island is situated in a residentially zoned area and in the past was the site of small cottage or camp that was used by the previous owners and current owners. Although no structure exists today, it was used in the past years for fishing, hunting and other recreational activity.

Mr. Kirrane stated that variances are difficult to obtain and there is certain criteria the Board must consider. The first relates to soil conditions, shape or typography of the land or structures which especially effect this particular lot and not generally affecting the Zoning District that this lot or parcel is located. In addition, the applicant should be able to demonstrate the existence of a hard-ship, and finally the relief be granted without substantial detriment to the public good or without nullifying or substantially derogating from the intent of the by-law.

Mr. Kirrane stated the lot itself is in excess of 3 acres and the proposed dwelling to be located on the lot would conform in all other respects to Zoning requirements and obviously there would be a need for the applicant to submit plans to Conservation, and Board of Health when the time arises to propose a single-family dwelling on the lot. He also mentioned the submitted plan shows the approximate location of the dwelling and where it would be situated.

**Conservation Comments:**

October 4, 2013 emailed received from Andrew McManus, Conservation Agent; "This will require a filing with the Conservation Department- Certified delineations of flood zone(s), coastal banks, salt marsh, bordering vegetated wetlands and/or any rare species habitat(s) must be supplied to the Conservation Commission for any and all disturbances within 100 feet of the aforementioned wetland resource areas- ref. Chapter 172-1 of the Mashpee wetland by-law & 310 CMR 10.00- State Wetlands Protection Act."

Mr. Furbush stated the plot plan depicts the setback from the wetlands to 100 feet on the left side and does not show the distance between the proposed house and wetlands. The required setback is 150 feet. The setback from the house and wetlands is 50 feet. He also stated the plan shows the flood zone as A11 which means the first floor of the dwelling would require to be 11 feet above water. He stated that he would not entertain any motion until he received definitive answers from other Boards.

Mr. Furbush stated there are specific questions to be addressed such as emergency access and disturbance of the wetlands. He is very concerned if three years from now someone has a medical emergency. He asked Mr. Thomas Rullo, Acting Fire Chief who was present at the meeting what the time-line the State allows to arrive at a particular house and the guideline.

**Fire Department Comments:**

August 12, 2013 email received from Fire Chief Baker stating; "I have met with the principles of the proposed residential occupancy on Gooseberry Island. As noted in the attached correspondence they will agree as a condition of a zoning wavier to install a residential fire sprinkler system. Due to the fact that they are taking this action I am not opposed to a waiver of 174-32 or other zoning requirements that have to do with road access. Please communicate this information to the Zoning Board of Appeals."

Thomas Rullo, Acting Fire Chief, addressed the Board to comment and answer any specific safety questions. He stated the only access to the Island is by boat and there would be a delay because there is no direct access. He stated there is an NFPA guideline, but Chief Baker had a guideline that he tried to uphold for over 20 years and that is a 6-7 minute mark, and would not be able to meet this time. Under normal circumstances, it's going to be delayed. Under adverse weather conditions, he was not sure he could arrive at all. He stated that former Fire Chief Baker had asked or was rendering an answer to the question of the building of the house and does not pertain to the access. He stated that Fire Chief Baker only addressed the house and not access. He stated that the sprinkler system is not designed to put out a fire. A sprinkler system is designed to contain the fire so the Fire Department has time to respond to a structure and put the fire out. The sprinkler system is designed to give the occupants more time to exit the home safely. This is for any structure whether commercial or residential.

Mr. Rullo stated the only access to the Island would be by boat from the Mashpee Neck dock location. He stated the boat is stored at the main fire station off Route 151.

3

MASHPEE ZONING BOARD OF APPEALS
Robert D. Emmeluth, Trustee
0 Gooseberry Island, (Map 100 Parcel 6-0-R)
Mashpee, MA 02649
V-2013-46

**Board of Health Comments**:

October 9, 2013 emailed received from Glen Harrington, Mashpee Health Agent; "The October 4, 2013 plan depicts a septic system that is 100' from wetland but it does not meet the BOH 150' setback requirement for a coastal bank. A potable well must be proven before a building permit is issued. The BOH well setback requirement is 150'. This will be treated as new construction as no septic permits exist or evidence of previous occupied dwellings on the Island exist in BOH records".

**Harbormaster Comments**:

October 7, 2013 emailed received from Stephen Mone, Harbormaster stating; he wanted to know how the occupants would access the island, a dock on island, a dock on mainland, or bridge. He also stated the Tribe has a working shellfish grant around the island that may restrict access.

**Public Comments:**

Vice Chairman, Mr. Blaisdell read letters submitted to the Board by abutters that reside at 70 Punkhorn Point Road, 77 Punkhorn Point Road, 79 Punkhorn Point Road, 85 Punkhorn Point Road and 89 Punkhorn Point Road that were in favor of the proposed project.

Several abutters and Representatives of the Mashpee Wampanoag Tribe were present and addressed the Board and spoke in opposition. Jessie (Little Doe) Baird, Vice Chairman of the Mashpee Wampanoag Tribe stated her concerns the applicant had no regard for conditions of the Island or the shellfish grant. Attorney Charles Savon, representing his client that resides at 84 Punkhorn Point Road opposed stating this variance is a "self-imposed" hardship and does not qualify under case law as a hardship and inconsistent with the bylaw of a lot fronting a street. Tribal Chairman, Cedric Cromwell approached the Board stating he is strongly against the proposal besides safety and health is environment concerns for Popponesset Bay. John Weltman, of 80 Punkhorn Point Road spoke in opposition regarding safety issues. George Green, Assistant Director of the Natural Resource Department for the Tribe is opposed to the project and described the detail of the shellfish grant and hope to reach the 90% TMDL benchmark lowering sewer costs for the Town.

**General Findings:**

Gooseberry Island consists of 3.9 acres.

MASHPEE ZONING BOARD OF APPEALS
Robert D. Emmeluth, Trustee
0 Gooseberry Island, (Map 100 Parcel 6-0-R)
Mashpee, MA 02649
V-2013-46

**Specific Criteria:**

**§174-32        Fire protection:**
To ensure that all buildings shall be accessible to Fire Department apparatus by way of access roadways capable of supporting firefighting apparatus with an all-weather surface roadway, there shall be an unobstructed, paved access roadway of not less than twenty (20') feet with a vertical clearance of not less than thirteen (13') feet six (6") inches with all corners having a minimum inside radius of not less than twenty-eight (28') feet and a minimum outside radius of not less than forty-six (46') feet. Said access roadway shall be constructed to a point not less than one hundred fifty (150') feet from the furthest point of any building on the lot. Where there is a lot with only a one-family dwelling and/or a residential accessory building, such access, where it lies within the lot, may be by a maintained all-weather surface driveway, constructed by any combination and manipulation of soils, with or without admixtures, which produce a firm mass capable of supporting fire apparatus in all weather conditions and having an improved surface width of twelve (12') feet and a cleared width of sixteen (16') feet.
History: Added 5-6 1985, ATM, Article 22, approved by Attorney General 9-12-1985.
History: Amended 10-3-1994, ATM, Article 18, approved by Attorney General 1-18-1995.

Mr. Furbush concluded stating the several concerns with this project were medical emergencies, public safety, the question of hardship and the Tribe's comments on the effect of the oyster beds and septic system.

The Board, upon review of the testimony and evidence, determined that the proposed Variance would not advance the Town's interest in maintaining the public safety in further grant of Variance would in fact derogate from the underline purpose and intent of the Zoning By-laws.

In view of the foregoing, the Board made a motion on October 9, 2013 at the Public Hearings of the Zoning Board of Appeals and voted as follows: Mr. Jonathan D. Furbush, denied, Mr. William A. Blaisdell, denied, Mr. James Reiffarth, denied, Mr. Richard Jodka, in favor, Mr. Domingo K. DeBarros, denied, the Petitioner, Robert D. Emmeluth, Trustee, Gooseberry Island Trust request for a Variance from Article VII §174-32 of the Zoning By-laws requiring Fire Department apparatus access as defined in said Section to allow for the construction of a single family residence on property located in an R-3 Zoning District at 0 Gooseberry Island, (Map 100, Parcel 6-0-R), Mashpee, MA.

5

# MASHPEE ZONING BOARD OF APPEALS
Robert D. Emmeluth, Trustee
0 Gooseberry Island, (Map 100 Parcel 6-0-R)
Mashpee, MA 02649
V-2013-46

IN FAVOR: _____     TO DENY: _____
Jonathan Furbush

IN FAVOR: _____     TO DENY: _____
William A. Blaisdell

IN FAVOR: _____     TO DENY: _____
James Reiffarth

IN FAVOR: _____     TO DENY: _____
Richard Jodka

IN FAVOR: _____     TO DENY: _____
Domingo K. DeBarros

This Decision has been duly filed on October 22, 2013 with the Town Clerk of Mashpee. Any Appeals shall be made pursuant to Section 17 of the Massachusetts General Laws Chapter 40A within Twenty days after the date of said filing.

This Decision is effective when a Certified Copy is filed at the Barnstable County Registry of Deeds. A Certified Copy may be obtained from the Town Clerk the next business day after the expiration of the 20-day Appeal phase, which lasts through November 11, 2013

Special Permits shall lapse two years after date of grant. Appeals shall lapse one year after date of grant. If the rights authorized by a Variance are not exercised within one year of date of grant of such Variance, such rights shall lapse unless: (1) substantial use or construction has commenced, or (2) a Petition for a six-month extension has been filed prior to the expiration date, or (3) the property that is the subject of the Variance has been conveyed in reliance on said Variance prior to the expiration date of such one year period.

6

TOWN
OF
MASHPEE
MASHPEE ZONING BOARD OF AP-
PEALS
PUBLIC HEARINGS NOTICE
OCTOBER 9, 2013
The Mashpee Zoning Board of Ap-
peals will hold Public Hearings on
Wednesday,
October 9, 2013, at 6:00 p.m. (Waquoit
Meeting Room) at the Mashpee Town
Hall,
16 Great Neck Road North, on the
following:
NEW HEARINGS
Robert D. Emmeluth, Trustee: Requests a Variance
from Article V §174-12 of the Zoning By-laws requiring
frontage on a street and direct access to a paved road,
county or state road or street as defined in said Section
in order to construct a single family residence on property
located in an R-3 Zoning District at 0 Gooseberry Island,
(Map 100, Parcel 6-0-R), Mashpee, MA.
Robert D. Emmeluth, Trustee: Requests a Variance
from Article V §174-31 of the Zoning By-laws requiring a
150' of frontage on a street in order to construct a single
family residence on property located in an R-3 Zoning
District at 0 Gooseberry Island, (Map 100, Parcel 6-0-R),
Mashpee, MA.
Robert D. Emmeluth, Trustee: Requests a Variance
from Article VII §174-32 of the Zoning By-laws requir-
ing Fire Department apparatus access as defined in
said Section to allow for the construction of a single
family residence on property located in an R-3 Zoning
District at 0 Gooseberry Island, (Map 100, Parcel 6-0-R),
Mashpee, MA.
TGD Mashpee Village LP: Request a modification to
the 1974 Special Permit under §174-24(O) 9 (a) (b) of the
Zoning By-laws and M.G.L. Chapter 40A 30 to allow for
construction of a single additional accessory building on
property located in an R-6 Zoning District at One Wampa-
noag Drive, (Map 66 Parcel 1-C-R), Mashpee, MA.
Yelena & Lazar Kaufman: Request a Variance under Ar-
ticle V §174-31 (Land Space Requirements) of the Zoning
By-Laws to vary the rear and side setback requirements
to allow for construction of a deck on property located in
an R-5 Zoning District at 79 Pond Circle (Map 94 Parcel
90), Mashpee, MA.
Plans may be viewed prior to the hearings in the ZBA
office and the Town Clerk's office.
Per Order of
Jonathan D. Furbush, Chairman
Mashpee Zoning Board of Appeals
September 20, 27, 2013

MASHPEE TOWN CLERK
OCT 2 2 2013
RECEIVED BY _____

# EXHIBIT 11

## THE OFFICE OF APPEALS AND DISPUTE RESOLUTION

**June 16, 2017**

| | |
|---|---|
| In the Matter of | OADR Docket No. WET-2015-016 |
| Gooseberry Island Trust and | DEP File No. SE-43-2773 |
| SN Trust | Mashpee, MA |

## RECOMMENDED FINAL DECISION

## INTRODUCTION

The Gooseberry Island Trust and the SN Trust (collectively "the Petitioners") originally filed this appeal challenging a Superseding Order of Conditions ("SOC") that the Southeast Regional Office of the Massachusetts Department of Environmental Protection ("MassDEP" or "the Department") issued to the Petitioners pursuant to the Massachusetts Wetlands Protection Act, G.L. c. 131, § 40 ("MWPA") and the Wetlands Regulations, 310 CMR 10.00 et seq. ("the Wetlands Regulations") denying their proposed construction of a timber bridge extending from 0 Punkhorn Point Road in Mashpee, Massachusetts ("Mashpee") across a narrow channel of water to Gooseberry Island in Mashpee ("the original proposed Project"). SOC, at pp. 1-2. The proposed timber bridge was to be an 11 feet wide by 200 feet long structure supported by thirty-nine 14 inch diameter timber piles that was to provide vehicular and pedestrian access from the

This information is available in alternate format. Call Michelle Waters-Ekanem, Diversity Director, at 617-292-5751. TDD# 1-866-539-7622
or 1-617-574-6868
MassDEP Website: www.mass.gov

♻ Printed on Recycled Paper

Mashpee mainland to Gooseberry Island. Id. The proposed timber bridge was also to facilitate the Petitioners' construction of a single family home on Gooseberry Island, which the Town of Mashpee Zoning Board of Appeals ("ZBA") had previously rejected due to the lack of vehicular access between Gooseberry Island and the Mashpee mainland. Pre-filed Direct Testimony of Thomas J. Bunker, PLS ("Mr. Bunker's PFT"), ¶ 12.

The Department's SOC affirmed the Town of Mashpee Conservation Commission's ("MCC") earlier denial of the original proposed Project after determining that the Project failed to satisfy the Performance Standards for activities in Salt Marsh as set forth in the Wetlands Regulations at 310 CMR 10.32(3) and 10.32(4).[1] SOC, at p. 2. The Department determined that the original proposed Project failed to satisfy the Performance Standards for Salt Marsh for the following reasons. Id.

310 CMR 10.32(3) provides in relevant part that "[a] proposed project in a salt marsh, on lands within 100 feet of a salt marsh, or in a body of water adjacent to a salt marsh shall not destroy any portion of the salt marsh and shall not have an adverse effect on the productivity of the salt marsh." The Department determined that "[t]he [original] proposed project would destroy salt marsh and would have an adverse effect on the productivity of the salt marsh"

---

[1] The Wetlands Regulations at 310 CMR 10.32(2) define "Salt Marsh" as:

> a coastal wetland that extends landward up to the highest high tide line, that is, the highest spring tide of the year, and is characterized by plants that are well adapted to or prefer living in, saline soils. Dominant plants within salt marshes typically include salt meadow cord grass (*Spartina patens*) and/or salt marsh cord grass (*Spartina alterniflora*), but may also include, without limitation, spike grass (*Distichlis spicata*), high-tide bush (*Iva frutescens*), black grass (*Juncus gerardii*), and common reedgrass (*Phragmites*). A salt marsh may contain tidal creeks, ditches and pools.

Under the Regulations, "Salt marshes are significant to protection of marine fisheries, wildlife habitat, and where there are shellfish, to protection of land containing shellfish, and prevention of pollution and are likely to be significant to storm damage prevention and ground water supply." 310 CMR 10.32(1). As such, no work or activities may be authorized in Salt Marsh unless they satisfy the applicable "Performance Standards" in 310 CMR 10.32(3)-10.32(6). "Performance Standards" are "th[e] requirements established by [the Wetlands Regulations] for activities in or affecting [specific wetlands areas protected by MWPA]." 310 CMR 10.04. The Performance Standards appear at 310 CMR 10.25 through 10.35 and 10.37, and 310 CMR 10.54 through 10.60. Id.

because: (1) "the installation of [sixteen] 14-inch diameter piles within the salt marsh would result in the physical destruction of 17.1 square feet of salt marsh" and (2) "the shading impacts of 990 square feet of bridge decking would have an adverse effect on the productivity of the salt marsh by retarding growth and altering the distribution and composition of the underlying vegetation." SOC, at p. 2.

310 CMR 10.32(4) provides that "[n]otwithstanding the provisions of 310 CMR 10.32(3), a small project within a salt marsh, such as an elevated walkway or other structure which has no adverse effects other than blocking sunlight from the underlying vegetation for a portion of each day, may be permitted if such a project complies with all other applicable requirements of [the Wetlands Regulations at] 310 CMR 10.21 through 10.37." The Department determined that the Petitioners' proposed timber bridge was not a "small project" pursuant to 310 CMR 10.32(4) because "[the proposed] structure [would be] 11 feet wide by 200 feet long and utilize[e] [thirty-nine] 14-inch diameter piles to support the structure." SOC, at p. 2. The Department also determined that "[d]ue to its east-west orientation and size, the large bridge [would] block at least 50% of the sunlight from the underlying vegetation for the majority of, if not the entire day." Id.

The Petitioners initially claimed that the Department's SOC denying the original proposed Project was improper, but shortly after filing this appeal, they waived their challenge to the SOC by withdrawing their original proposed Project plan and submitting a revised proposed Project Plan ("Revised Project Plan") to the Department proposing to construct a steel bridge instead of a timber bridge. The Department supports the Petitioners' Revised Project Plan and requests that the Plan be reviewed and approved in this appeal pursuant to the Department's Plan Change Policy, as set forth in Wetlands Program Policy 91-1: Plan Changes, because the

Petitioners' proposed steel bridge alternative purportedly is not substantially different from their originally proposed timber bridge and reduces wetlands impacts and satisfies the Performance Standards for work in Salt Marsh at 310 CMR 10.32, Land Containing Shellfish at 310 CMR 10.34,[2] and Coastal Beach/Tidal Flat at 310 CMR 10.27(3) and 10.27(6).[3] See below, at pp. 28-50. However, the MCC and two groups of Intervenors opposed to the proposed Project[4] contend that the Petitioners' Revised Project Plan cannot be reviewed and approved in this appeal for

---

[2] Under 310 CMR 10.34(2), "Land Containing Shellfish means . . . salt marshes . . . when [they] . . . contain[n] shellfish." Shellfish are defined as including the following species: Bay scallop (Argopecten irradians); Blue mussel (Mytilus edulis); Ocean quahog (Arctica islandica); Oyster (Crassostrea virginica); Quahog (Mercenaria merceneria); Razor clam (Ensis directus); Sea clam (Spisula solidissima); Sea scallop (Placopecten magellanicus); and Soft shell clam (Mya arenaria). 310 CMR 10.34(2).

[3] Under 310 CMR 10.27(2):

> Coastal Beach [is] unconsolidated sediment subject to wave, tidal and coastal storm action which forms the gently sloping shore of a body of salt water and includes tidal flats. Coastal beaches extend from the mean low water line landward to the dune line, coastal bankline or the seaward edge of existing human-made structures, when these structures replace one of the above lines, whichever is closest to the ocean.

A Tidal Flat is defined as "any nearly level part of a coastal beach which usually extends from the mean low water line landward to the more steeply sloping face of the coastal beach or which may be separated from the beach by land under the ocean." 310 CMR 10.27(2).

[4] The Intervenors are:

> (1)   the members of the Wolpe, Atkins, and Weltman Group consisting of Robert A. Wolpe, Michelle A. Wolpe, James C. Atkins, Jr., and John J. Weltman, who contend that they own a portion of the land on which the Petitioners seek to build the bridge and where Salt Marsh is located; and

> (2)   the members of Mashpee Wampanoag Tribe Group consisting of the Mashpee Wampanoag Tribe, a federally recognized Indian tribe, and 12 of its Tribal Members, who contend that since 1977 the Tribe has held a Shellfish Grant License from the Town of Mashpee and approved by the Commonwealth that authorizes the Tribe to grow shellfish in the area where the Petitioners seek to build the bridge and that the bridge's construction will result in significant environmental impacts to the shellfish beds in the area and the permanent loss of shellfish habitat.

Wolpe, Atkins, and Weltman Group's Motion to Intervene (August 18, 2015); Mashpee Wampanoag Tribe Group's Motion to Intervene (August 18, 2015). The Mashpee Wampanoag Tribe and the members of Wolpe, Atkins, and Weltman Group previously actively opposed the original proposed Project while the Project was undergoing SOC review by the Department. See March 6, 2015 Letter to Department by Mark C. Tilden, legal counsel to Mashpee Wampanoag Tribe; March 2, 2015 Letter to Department by Brian M. Hurley, legal counsel to Robert Wolpe and John Weltman.

following reasons.

First, the MCC and the Intervenors contend that the Petitioners' appeal of the SOC was barred at the outset of appeal's filing because the MCC rejected the original proposed Project both pursuant to the MWPA and the Town of Mashpee's Wetlands Protection Bylaw and the Petitioners did not appeal the local Bylaw denial to Superior Court.[5] See below, at pp. 17-28. In the alternative, the MCC and the Intervenors contend that if the Petitioners' appeal of the SOC was not barred, the Petitioners' Revised Project Plan cannot be reviewed and approved in this appeal pursuant to the Department's Plan Change Policy because the Petitioners' proposed steel bridge alternative is substantially different from the originally proposed timber bridge, thus requiring the Petitioners to file a new NOI with the MCC seeking approval for construction of the steel bridge. See below, at pp. 28-50. They also contend that the Petitioners' construction of the steel bridge will increase, not decrease, impacts to Salt Marsh and Land Containing Shellfish. Id.

I conducted a one day evidentiary Adjudicatory Hearing to resolve the following issues raised by the parties' claims concerning the Petitioners' Revised Project Plan:

> 1. Whether the Petitioners' appeal of the SOC was barred at the time of the appeal's filing because they did not appeal to Superior Court

---

[5] In issuing its SOC, the Department only affirmed that aspect of the MCC's denial of the original proposed Project under the MWPA and the Wetlands Regulations because the Department lacks jurisdiction to review decisions of local conservation commissions under local Wetlands Protection Bylaws and Regulations. Oyster Creek Preservation, Inc. v. Conservation Commission of Harwich, 449 Mass. 859, 866-67 (2007); Healer v. Department of Environmental Protection, 73 Mass. App. 714, 716 (2009); In the Matter of John Walsh and Walsh Brothers Building Co., Inc., Memorandum and Order Denying Petitioners' and Harwich Conservation Commission's Joint Motion to Proceed (September 10, 2013), 2013 MA ENV LEXIS 92, at 10; Order Granting Petitioners' Renewed Motion to Proceed (September 18, 2014); Recommended Remand Decision (April 23, 2015), 2015 MA ENV LEXIS 35; Decision Adopting Recommended Remand Decision (June 2, 2015), 2015 MA ENV LEXIS 34.

the MCC's denial of the original proposed Project under the Mashpee Wetlands Protection Bylaw?[6]

    **a.**    Did the MCC issue its Order of Conditions denying the Petitioners' original proposed Project within 21 days after closing its public hearing on the Petitioners' original proposed Project in accordance with the MWPA and 310 CMR 10.05(6)(a)?

        **(1)**    Did the MCC's public hearing close on January 8, 2015 as the Petitioners assert or January 22, 2015 as the MCC asserts?

    **2.**    If the Petitioners' appeal of the SOC was not barred at the outset of the appeal's filing, does the Petitioners' revised Project Plan have plan changes that are substantially different from the original proposed Project plan requiring the filing of a new NOI with the MCC?

    **a.**    Do the plan changes significantly modify the project configuration?

    **b.**    If so, do the plan changes result in increased impacts to wetlands resource areas?

At the Adjudicatory Hearing, the parties and the Intervenors were represented by legal counsel and presented witnesses and documentary evidence in support of their respective positions in the case. A total of eight witnesses, including six expert witnesses, testified and each witness was cross-examined under oath on the sworn Pre-filed Testimony ("PFT") that the witness had filed prior to the Adjudicatory Hearing in support of the parties' respective positions in the case. The Adjudicatory Hearing was stenographically recorded by a certified Court reporter retained by the Petitioners and/or Intervenors at their expense, and the subsequent Hearing Transcript was made available to the parties following the Hearing, which assisted them

---

[6] The parties agreed that this was the threshold issue in this appeal because if the appeal was barred at the time of its filing, the second issue above regarding whether the Petitioners' Revised Project Plan could be reviewed and approved in this appeal pursuant to the Department's Plan Change Policy, would be moot.

in preparing their respective Closing Briefs in the case.

At the Adjudicatory Hearing, three witnesses testified on behalf of the Petitioners:

    (1)    Thomas Bunker ("Mr. Bunker"), a Professional Land Surveyor and a principal of BSS Design, Inc., a land surveying and civil engineering firm in Falmouth, Massachusetts;

    (2)    Joseph M. Forns ("Mr. Forns"), a Senior Environmental Scientist and principal of Applied Marine Ecological Lab, an environmental consulting firm in Falmouth, Massachusetts; and

    (3)    Matthew Haney, the Trustee of the Petitioner Gooseberry Island Trust and Trustee of the Petitioner SN Trust ("Mr. Haney").

One witness testified on behalf of the MCC: its Conservation Agent, Andrew R. McManus ("Mr. McManus").

One witness testified on behalf of the Intervenor Wolpe, Atkins, and Weltman Group: Robert F. Daylor ("Mr. Daylor"), who is a Professional Engineer, a Professional Land Surveyor, and a Senior Vice President of Tetra Tech, Inc., a national engineering consulting firm with offices in Marlborough, Massachusetts.

Two witnesses testified on behalf of the Intervenor Mashpee Wampanoag Tribe Group:

    (1)    Amy M. Ball ("Ms. Ball"), a Project Manager and Senior Ecologist at the Horsley Witten Group, Inc., an environmental consulting firm in Sandwich, Massachusetts; and

    (2)    George "Chuckie" Green ("Mr. Green"), the Assistant Director of Natural Resources for the Mashpee Wampanoag Tribe.

Lastly, one witness testified on behalf of the Department: Mark N. Bartow, an Environmental Analyst in the Wetlands Program in the Department's Southeast Regional Office who conducted the SOC review on behalf of the Department.

As discussed below, based on the testimonial and documentary evidence of the parties'

respective witnesses at the Adjudicatory Hearing, I find that:

(1) the Petitioners' appeal of the SOC was not barred at the time of the appeal's filing because in contravention to the MWPA and 310 CMR 10.05(6)(a), the MCC issued its Order of Conditions denying the original proposed Project more than 21 days after closing its public hearing on the Petitioners' NOI for the proposed Project, and, as such, the Petitioners were not required to appeal to Superior Court the MCC's rejection of the original proposed Project under the Mashpee Wetlands Protection Bylaw; and

(2) the Petitioners' Revised Project Plan cannot be reviewed and approved in this appeal pursuant to the Department's Plan Change Policy, because the Petitioners' proposed steel bridge alternative is substantially different from their originally proposed timber bridge and will increase impacts to Salt Marsh and Land Containing Shellfish.

Accordingly, I recommend that the Department's Commissioner issue a Final Decision: (1) affirming the Department's SOC denying the Petitioners' original proposed Project because the Petitioners waived any objections to the SOC by submitting a Revised Project Plan to the Department in this appeal; and (2) denying review and approval of the Petitioners' Revised Project Plan pursuant to the Department's Plan Change Policy because the Petitioners' proposed steel bridge alternative is substantially different from their originally proposed timber bridge and increases wetlands impacts to Salt Marsh and Land Containing Shellfish.

## BACKGROUND

The Petitioners own Gooseberry Island, a 3.5+/- acre island located in the northern part of Popponesset Bay in Mashpee approximately 200 feet offshore from the end of Punkhorn Point Road in Mashpee. Mr. Bunker's PFT, ¶ 9. Gooseberry Island is comprised of approximately two acres of forested upland and approximately 1.5+/- acres of Salt Marsh. Id.

Gooseberry Island is separated from the Mashpee Mainland by a small channel that is

approximately 40 feet wide at mean low water, and 80 feet wide at mean high water. Id., ¶ 10. The 200 feet offshore area separating Gooseberry Island and Punkhorn Point Road on the Mashpee Mainland consists of Salt Marsh. Id. The maximum water depth is less than two feet at mean low water, and the substrate in the channel consists of unconsolidated muck and silt. Id.

The Intervenor Mashpee Wampanoag Tribe possesses a Private Shellfish Grant that it received from the Town of Mashpee in 1977 pursuant to G.L. c. 130, §§ 57 – 68A. Pre-filed Direct Expert Testimony of Amy M. Ball ("Ms. Ball's PFT"), ¶ 9; Exhibit 6 to Ms. Ball's PFT; Pre-filed Direct Testimony of George "Chuckie" Green ("Mr. Green's PFT"), ¶¶ 1-4. The Tribe's Shellfish Grant is valid through 2027 and occupies the entirety of the tidal creek between the Mashpee mainland at Punkhorn Point Road and Gooseberry Island and nearly encircles the Island. Ms. Ball's PFT, ¶ 9. According to the Commonwealth's Division of Marine Fisheries ("DMF"),[7] the Tribe "currently grow[s] out American oysters [at the site], but would like the opportunity to grow out other shellfish species as well." Exhibit 6 to Ms. Ball's PFT. "Quahogs [have been] stocked on the south side of [Gooseberry] [I]sland while soft shell clam seed [has been] planted on the north side of the island." Id. "[The Tribe's] members partake in Sustenance Harvest of ribbed mussels, softshell clams, and quahogs annually." Mr. Green's PFT, ¶ 8.

Prior to seeking approval from the MCC for construction of their originally proposed timber bridge, the Petitioners sought approval from the Mashpee ZBA to construct a single-family home on Gooseberry Island without a means of vehicular access between the Island and

---

[7] DMF "is responsible for the conservation of marine fisheries resources[,] includ[ing] managing both recreational and commercial harvesting of saltwater finfish, shellfish, and crustaceans like lobster and crab." http://www.mass.gov/eea/agencies/dfg/about.

the Mashpee Mainland, including for public safety and other emergency vehicles. Mr. Bunker's

PFT, ¶ 12. The lack of such vehicular access caused the Mashpee ZBA in October 2013 to deny

the Petitioners' proposed construction of the single-family home. Id. As a result, the Petitioners

sought the MCC's approval under the MWPA, the Wetlands Regulations, and the Mashpee

Wetlands Protection By-law to construct the timber bridge to provide vehicular access between

Gooseberry Island and the Mashpee Mainland. Id. As discussed above, both the MCC and the

Department rejected the Petitioners' proposed construction of the timber bridge pursuant to the

MWPA and the Wetlands Regulations, and the MCC also rejected the Project pursuant to the

Mashpee Wetlands Protection By-law. The Petitioners then presented their steel bridge

alternative to the Department through the Revised Project Plan during the pendency of this

appeal of the Department's SOC.

## STATUTORY AND REGULATORY FRAMEWORK

The purpose of the MWPA and the Wetlands Regulations is to protect wetlands and to

regulate activities affecting wetlands areas in a manner that promotes the following eight

statutory interests:

> (1) protection of public and private water supply;
>
> (2) protection of ground water supply;
>
> (3) flood control;
>
> (4) storm damage prevention;
>
> (5) prevention of pollution;
>
> (6) protection of land containing shellfish;
>
> (7) protection of fisheries; and
>
> (8) protection of wildlife habitat.

G.L. c. 131, § 40; 310 CMR 10.01(2); In the Matter of Gary Vecchione, OADR Docket No.

WET-2014-008, Recommended Final Decision (August 28, 2014), 2014 MA ENV LEXIS 76, at

6-7, adopted as Final Decision (September 23, 2014), 2014 MA ENV LEXIS 77; In the Matter of

Webster Ventures, LLC, OADR Docket No. WET-2014-016, Recommended Final Decision

(February 27, 2015), 2015 MA ENV LEXIS 14, at 10-11, adopted as Final Decision (March 26,

2015), 2015 MA ENV LEXIS 10; In the Matter of Elite Home Builders, LLC, OADR Docket

No. WET-2015-010, Recommended Final Decision (November 25, 2015), adopted as Final

Decision (December 17, 2015), 22 DEPR 202, 204 (2015); In the Matter of Sunset City, Inc.,

OADR Docket No. WET-2016-016, Recommended Final Decision (March 31, 2017), 2017 MA

ENV LEXIS 35, at 9-10, adopted as Final Decision (April 21, 2017, 2017 MA ENV LEXIS 33.

     The MWPA and the Wetlands Regulations provide that "[n]o person shall remove, fill,

dredge[,] or alter[8] any [wetlands] area subject to protection under [the MWPA and Wetlands

Regulations] without the required authorization, or cause, suffer or allow such activity . . . ."

G.L. c. 131 § 40, ¶ 32; 310 CMR 10.02(2)(a); Vecchione, 2014 MA ENV LEXIS 76, at 7;

Webster Ventures, 2015 MA ENV LEXIS 14, at 11-12; Elite Home Builders, 22 DEPR at 204;

---

[8] The Wetlands Regulations at 310 CMR 10.04 define "alter" as "chang[ing] the condition" of any wetlands area subject to protection under the MWPA and the Wetlands Regulations. Examples of alterations include, but are not limited to, the following:

    (a) the changing of pre-existing drainage characteristics, flushing characteristics, salinity distribution, sedimentation patterns, flow patterns and flood retention areas;

    (b) the lowering of the water level or water table;

    (c) the destruction of vegetation;

    (d) the changing of water temperature, biochemical oxygen demand (BOD), and other physical, biological or chemical characteristics of the receiving water.

310 CMR 10.04. "Dredge" is defined as "deepen[ing], widen[ing], or excavat[ing], either temporarily or permanently" a protected wetlands area, and "[f]ill means to deposit any material [in a protected wetlands area] so as to raise an elevation, either temporarily or permanently." Id.

Sunset City, 2017 MA ENV LEXIS 35, at 10. "Any activity proposed or undertaken within [a protected wetlands] area[,] . . . which will remove, dredge or alter that area, is subject to Regulation under [the MWPA and the Wetlands Regulations] and requires the filing of a Notice of Intent ("NOI")" with the permit issuing authority. 310 CMR 10.02(2)(a). A party must also file an NOI for "[a]ny activity . . . proposed or undertaken within 100 feet of [any protected wetlands]" described as "the Buffer Zone" by the Regulations, "which, in the judgment of the [permit] issuing authority, will alter [any protected wetlands]." 310 CMR 10.02(2)(b).

The "[permit] issuing authority" is either the local Conservation Commission when initially reviewing the applicant's proposed work in a wetlands resource area protected by the MWPA and the Wetlands Regulations, or the Department when it assumes primary review of the proposed work or review on appeal from a local Conservation Commission decision. Healer, 73 Mass. App. Ct. at 717-19. Under the MWPA, a local Conservation Commission may issue an Order of Conditions authorizing or precluding proposed construction activities in protected wetlands areas and "[is] allowed to 'impose such conditions as will contribute to the protection of the interests described [in MWPA and the Wetlands Regulations]'" and to require that "'all work shall be done in accordance' with the conditions they might impose. . . ." Id.

Orders of Condition, including any findings and wetlands delineations forming the basis of the Orders, are valid for three years from the date of the Orders' issuance. 310 CMR 10.05(6)(d). However, any "order [by the Department] shall supersede the prior order of the conservation commission [issued pursuant to the MWPA and the Wetlands Regulations]. . . and all work shall be done in accordance with the [Department's] order," Id., unless the Commission has properly denied the proposed project pursuant to a local Wetlands Protection Bylaw that is more protective than the MWPA. Oyster Creek, 449 Mass. at 866. This is the case because the

MWPA "establishes Statewide minimum wetlands protection standards, [but] local communities are free to impose more stringent requirements" by enacting local Wetlands Protection Bylaws. Oyster Creek, 449 Mass. at 866; Healer, 73 Mass. App. At 716. As a result, an SOC issued by the Department under the MWPA approving proposed work in protected wetlands areas cannot preempt a timely decision of a local conservation commission denying approval of the proposed work based "on provisions of a local bylaw that are more protective than the [MWPA]." Oyster Creek, 449 Mass. at 866. This deference to local regulation is supported by General Condition No. 3 that appears in every SOC issued by the Department. Walsh, 2013 MA ENV LEXIS 92, at 10.

General Condition No. 3 provides that the SOC "does not relieve the [applicant] . . . of *the necessity* of complying with all other applicable, federal, state, or *local statutes, ordinances, bylaws, or regulations.*" (emphasis supplied). Hence, if a project is denied under a local Wetlands Protection Bylaw, and "[the] denial . . . become[s] final . . . either because it is not appealed [to Superior Court][9] or because on appeal the denial is affirmed [by the Court], there remains no doubt that . . . [t]his forecloses [the applicant's ability to comply] with wetlands General Condition [No.] 3 and, . . . therefore, . . . the project cannot [proceed]." Walsh, 2013 MA ENV LEXIS 92, at 11-12, citing, In the Matter of Howard Fafard, Docket Nos. 96-040, 96-044, Final Decision (December 4, 1996), 1996 MA ENV LEXIS 122 at 6. In sum, "[a] final local wetlands bylaw denial thus makes . . . further project review under the [MWPA] and [the

---

[9] Decisions of local conservation commissions approving or rejecting proposed activities in protected wetlands areas pursuant to local wetlands protection bylaws are generally appealable to the Superior Court pursuant to the Certiorari Statute, G.L. c. 249, § 4. The statute provides in relevant part that:

> [a] civil action in the nature of certiorari to correct errors in proceedings which are not according to the course of the common law, which proceedings are not otherwise reviewable by motion or by appeal, may be brought in the supreme judicial or superior court[,] [and that] . . . [s]uch action shall be commenced within sixty days next after the proceeding complained of.

Wetlands] Regulations, [a] . . . futile academic exercise[e]," and as result, an administrative appeal challenging an SOC authorizing the project should be dismissed as moot in accordance with 310 CMR 1.01(5)(a)2.[10] Walsh, 2013 MA ENV LEXIS 92, at 11-12, citing, Fafard, at 7. "[The SOC] must [also] be vacated in the final decision dismissing the appeal as moot, since the final local wetlands bylaw denial establishes that the project [cannot] be built as conditioned and [cannot] comply with General Condition 3 if it were built." Id.

However, a local Conservation Commission's right to deny a proposed project pursuant to a local Wetlands Protection Bylaw that is more protective than the MWPA will be lost if the Commission's decision denying the proposed project is untimely. Oyster Creek, 449 Mass. at 862-63. As discussed above, any person seeking to perform work within a wetlands area protected by the MWPA and the Wetlands Regulations must file an NOI with the local Conservation Commission seeking approval of the proposed work. 310 CMR 10.02(2)(a) and 10.02(2)(b). The MWPA and the Wetlands Regulations require "the conservation commission [to] hold a public hearing on the proposed project within twenty-one days after receiving the [NOI]." Oyster Creek, 449 Mass. at 862-63. "The [MWPA] further prescribes that the conservation commission 'shall . . . within twenty-one days of such hearing' issue a written order that imposes conditions on the proposed work to be done (including denial of the project), or that determines no conditions are necessary." Id., at 863. This 21 day time limitation is also set forth in the Wetlands Regulations at 310 CMR 10.05(6)(a). As the SJC held in Oyster Creek, the failure of a local Conservation Commission to abide by this 21 day deadline will have negative

---

[10] 310 CMR 1.01(5)(a)2 provides in relevant part that "[t]he Presiding Officer may, on the Presiding Officer's own initiative or on a party's motion where appropriate . . . dismiss appeals for . . . mootness, . . . or where the record discloses that the proposed project [or] activity has been denied by a local, state or federal agency or authority pursuant to law other than that relied on by the Department in the decision appealed from, and such denial has become final").

consequences on the Commission's attempt to deny a proposed project under a local Wetlands

Protection Bylaw. Under these circumstances, the Commission's denial under a local Bylaw

does not override the Department's SOC approving or denying a proposed project. 449 Mass. at

866. In the SJC's words: "where a conservation commission issues its [Order] after the [21 day]

statutory deadline, . . . [the commission] lose[s] the right to insist on the provisions of its local

bylaw, and . . . any superseding order issued by the [Department] . . . appl[ies] in its stead." Id.

## FINDINGS

### I.    THE PETITIONERS' BURDEN OF PROOF AT THE HEARING

As I explained to the parties at the Pre-Hearing Conference that I conducted with them

several months prior to the Adjudicatory Hearing, the Petitioners had the burden of proving by a

preponderance of the evidence at the Hearing that: (1) their appeal of the SOC was not barred at

the time of the appeal's filing; and (2) their Revised Project Plan could be reviewed and

approved in this appeal pursuant to the Department's Plan Change Policy. 310 CMR 10.03(2),

10.05(7)(j)2.b.iv, 10.05(7)(j)2.b.v, 10.05(7)(j)3.a, 10.04, 10.05(7)(j)3.b; In the Matter of Jodi

Dupras, OADR Docket No. WET-2012-026, Recommended Final Decision (July 3, 2013), 2013

MA ENV LEXIS 40, at 10-13, adopted as Final Decision (July 12, 2013), 2013 MA ENV LEXIS

61; Vecchione, 2014 MA ENV LEXIS 76, at 10; Webster Ventures, 2015 MA ENV LEXIS 14,

at 33-34; Elite Home Builders, 22 DEPR at 205; Sunset City, 2017 MA ENV LEXIS 35, at 15-

16.

Specifically, the Petitioners were required to present "credible evidence from a competent

source in support of . . . [their claims], including any relevant expert report(s), plan(s), or

photograph(s)." 310 CMR 10.05(7)(j)3.c; Dupras, 2013 MA ENV LEXIS 40, at 11; Vecchione,

supra, 2014 MA ENV LEXIS 76, at 10; Webster Ventures, 2015 MA ENV LEXIS 14, at 34;

Elite Home Builders, 22 DEPR at 205; Sunset City, 2017 MA ENV LEXIS 35, at 16. "A 'competent source' is a witness who has sufficient expertise to render testimony on the technical issues on appeal." In the Matter of City of Pittsfield Airport Commission, OADR Docket No. 2010-041, Recommended Final Decision (August 11, 2010), 2010 MA ENV LEXIS 89, at 36-37, adopted as Final Decision (August 19, 2010), 2010 MA ENV LEXIS 31; Dupras, 2013 MA ENV LEXIS 40, at 11-12; Vecchione, 2014 MA ENV LEXIS 76, at 10; Webster Ventures, 2015 MA ENV LEXIS 14, at 34-35; Elite Home Builders, 22 DEPR at 205; Sunset City, supra, 2017 MA ENV LEXIS 35, at 16. Whether the witness has such expertise depends "[on] whether the witness has sufficient education, training, experience and familiarity with the subject matter of the testimony." Commonwealth v. Cheromcka, 66 Mass. App. Ct. 771, 786 (2006) (internal quotations omitted); see e.g. Pittsfield Airport Commission, supra, 2010 MA ENV LEXIS 89, at 36-39 (petitioner's failure to submit expert testimony in appeal challenging MassDEP Commissioner's issuance of 401 Water Quality Certification Variance to Pittsfield Airport Commission fatal to petitioner's claims because Variance was "detailed and technical . . . requiring expert testimony on issues . . . implicated by the Variance," including . . . (1) wetland replication, restoration, and enhancement, (2) mitigation of environmental impacts to streams, and (3) stormwater discharge and treatment[,] [and (4)] . . . runway safety and design"); Dupras, 2013 MA ENV LEXIS 40, at 36-37 (petitioner not qualified to interpret technical data involving Shellfish Suitability Areas); Vecchione, 2014 MA ENV LEXIS 76, at 26 (petitioner not qualified to testify as to impacts on wetlands resources areas due to his lack of expertise in wetlands protection).

As for the relevancy, admissibility, and weight of evidence that the parties sought to

introduce at the Adjudicatory Hearing, these issues were governed by G.L. c. 30A, § 11(2) and 310 CMR 1.01(8)(a). Under G.L. c. 30A, § 11(2):

> [u]nless otherwise provided by any law, agencies need not observe the rules of evidence observed by courts, but shall observe the rules of privilege recognized by law. Evidence may be admitted and given probative effect only if it is the kind of evidence on which reasonable persons are accustomed to rely in the conduct of serious affairs. Agencies may exclude unduly repetitious evidence, whether offered on direct examination or cross-examination of witnesses.

Under 310 CMR 1.01(8)(a), "[t]he weight to be attached to any evidence . . . rest[ed] within the discretion of the Presiding Officer. . . ."

As discussed below, the Petitioners met their burden of proving that their appeal of the SOC was not barred at the time of the appeal's filing as a result of not having appealed to Superior Court the MCC's denial of the original proposed Project under the Mashpee Wetlands Protection By-law. See below, at pp. 17-28. However, the Petitioners failed to meet their burden of proving that their Revised Project Plan could be reviewed and approved in this appeal pursuant to the Department's Plan Change Policy. See below, at pp. 28-50.

## II.  THE PETITIONERS' APPEAL OF THE SOC WAS NOT BARRED AT THE TIME OF THE APPEAL'S FILING

The MWPA provides that:

> *[t]he conservation commission . . . shall hold a public hearing on the proposed activity within twenty-one days of the receipt of [the NOI]. . . .* If after said hearing the conservation commission . . . determine[s] that the area on which the proposed work is to be done is significant to public or private water supply, to the groundwater supply, to flood control, to storm damage prevention, to prevention of pollution, to protection of land containing shellfish, to the protection of wildlife habitat or to the protection of fisheries or to the protection of the riverfront area consistent with the following purposes: to protect the private or public water supply; to protect the ground water; to provide flood control; to prevent storm damage; to prevent pollution; to protect land containing shellfish; to protect wildlife habitat; and to protect the fisheries, *[the] conservation commission . . . shall by written order within twenty-one days of such hearing impose such*

*conditions as will contribute to the protection of the interests described herein, and all work shall be done in accordance therewith. . . .*

G.L. c. 131, § 40 (emphasis supplied). The MWPA also provides that:

> *[i]f a conservation commission has failed to hold a hearing within the twenty-one day period as required,* or if a commission, after holding such a hearing has failed within twenty-one days therefrom to issue an order, . . . *the applicant,* any person aggrieved by said commission's order or failure to act, or any owner of land abutting the land upon which the proposed work is to be done, or any ten residents of the city or town in which said land is located, *may, by certified mail and within ten days from said commission's order or failure to act, request [an SOC from the Department] . . . .*

Id. (emphasis supplied).

The Wetlands Regulations at 310 CMR 10.05(a) repeat the MWPA's requirement that "[a] public hearing shall be held by the conservation commission [on an NOI] within 21 days of [its] receipt of the [NOI] . . . ." Under 310 CMR 10.05(b), "[p]ublic hearings [on an NOI] may be continued [only] as follows":

1. without the consent of the applicant to a date, announced at the hearing, within 21 days, of receipt of [an NOI];

2. with the consent of the applicant, to an agreed-upon date, which shall be announced at the hearing; or

3. with the consent of the applicant for a period not to exceed 21 days after the submission of a specified piece of information or the occurrence of a specified action. The date, time and place of [the] continued hearing shall be publicized in accordance with [the MWPA], and notice shall be sent to any person at the hearing who so requests in writing.

The provisions of 310 CMR 10.05(6)(a) make clear that "[w]ithin 21 days of the close of [its] public hearing [on an NOI], the conservation commission shall either":

1. make a determination that the area on which the work is proposed to be done . . . is not significant to any of the [MWPA] interests [set forth above] . . .; or

2. make a determination that the area on which the work is proposed to be

done . . . is significant to one or more of the [MWPA] interests [set forth
above], and shall issue an Order of Conditions for the protection of said
interests . . . .

Here, it is undisputed that the MCC issued its Order of Conditions denying the original

proposed Project on February 11, 2015 and that the Petitioners did not appeal to Superior Court

the MCC's denial under the Mashpee Wetlands Protection Bylaw. It is the Petitioners' and the

Department's position that the Petitioners did not have to appeal to Superior Court the MCC's

denial under Mashpee Wetlands Protection Bylaw because the MCC issued its Order of

Conditions more than 21 days after closing its public hearing on the Petitioners' NOI for the

original proposed Project. The MCC and the Intervenors, however, take the opposite view,

contending that the MCC issued its Order of Conditions within the required 21 day period, and,

as such, the Petitioners' appeal of the SOC was barred at the time of the appeal's filing because

the Petitioners did not appeal to Superior Court the MCC's denial under Mashpee Wetlands

Protection Bylaw. Based on the MWPA and the Wetlands Regulations and a strong

preponderance of the evidence introduced at the Adjudicatory Hearing, I find that the Petitioners'

appeal of the SOC was not barred at the time of the appeal's filing because the MCC issued its

Order of Conditions beyond the required 21 day period, and, as a result, the Petitioners were not

required to appeal to Superior Court the MCC's local bylaw denial of the original proposed

Project.

The MCC and the Intervenors contend that the MCC closed its public hearing on the

Petitioners' NOI for the original proposed Project on January 22, 2015, making February 12,

2015 as the 21 day deadline date under the MWPA and 310 CMR 10.05(6)(a) for the MCC to

issue its Order of Conditions, and that the MCC met the deadline by issuing its Order of denial

on February 11, 2015. The evidence introduced at the Hearing, however, demonstrates that the

MCC closed its public hearing on the Petitioners' NOI for the original proposed Project on January 8, 2015, making January 29, 2015 as the 21 day deadline date for the MCC's issuance of its Order of Conditions on the NOI.

This evidence includes a transcript of the MCC's January 8, 2015 public hearing on the Petitioners' NOI for the original proposed Project, which demonstrates that the MCC closed its public hearing on the Petitioners' NOI on that date, and not on January 22, 2015, as the MCC and the Intervenors contend.[11] The transcript shows that the MCC closed its public hearing on January 8, 2015 after the Petitioners' counsel, the MCC's members, and the MCC's Conservation Agent, Mr. McManus, had the following extended discussion regarding whether the MCC should close the public hearing on that date:

> **MR. MCMANUS TO THE MCC:**    The way I see it, you have two choices before you: [1] You can continue the issue to read into the materials which have been gone over verbally before you tonight, or [2] you can render a decision whether you believe the project meets the [wetlands] performance standards. . . .[12]
>
> **THE PETITIONERS' COUNSEL[13] TO THE MCC:**    There's a third option that Mr. McManus didn't mention, which is that if you do feel that you have enough information, you could close tonight, but not make a decision, because you have twenty-one days from the day of the close of the hearing to make a decision.[14]

---

[11] A copy of the MCC's Hearing Transcript of January 8, 2015 is attached as Exhibit 1 to the PFT of the Petitioners' witness, Mr. Haney. The Transcript is cited above in the text as "MCC's Jan. 8, 2015 Transcript."

[12] MCC's Jan. 8, 2015 Transcript, at p. 5, lines 18-23 (bracketed numbers supplied).

[13] The Petitioners' counsel in the MCC's Jan. 8, 2015 Transcript is designated by name "Unidentified."

[14] MCC's Jan. 8, 2015 Transcript, at p. 9, lines 7-13.

**MR. MCMANUS TO THE MCC:**     Yes. [15]

**THE PETITIONERS' COUNSEL TO THE MCC:**     So, a third option is to
Close [the hearing], but read everything and deliberate at your subsequent
meeting. [16] . . .

**MCC MEMBER TO THE PETITIIONERS' COUNSEL:**     What's the
advantage to that? [17]

**THE MCC CHAIRMAN TO THE PETITIONERS' COUNSEL:**     Yeah,
what's the advantage of that? [18]

**THE PETITIONERS' COUNSEL TO THE MCC:**     The advantage to that,
as I see it, is, it ends this process of back-and-forth.  In other words, you wouldn't
be sitting in this same situation two weeks from now when additional information
has been submitted by us, responded to by three other consultants, and now
you're back in the same situation.  It would cut off the discussion at this point.
But we won't want to do that if you . . . feel that we need to provide additional
information.  We want to give you everything you need to render a decision. [19]

**THE MCC CHAIRMAN TO THE PETITIONERS' COUNSEL:**     We
want to make the right decision.  We've had some problems with decisions that
we've had to rectify. [20]

---

[15] MCC's Jan. 8, 2015 Transcript, at p. 9, line 14.

[16] MCC's Jan. 8, 2015 Transcript, at p. 9, lines 15-17.

[17] MCC's Jan. 8, 2015 Transcript, at p. 9, lines 19-20.

[18] MCC's Jan. 8, 2015 Transcript, at p. 9, lines 21-22.

[19] MCC's Jan. 8, 2015 Transcript, at p. 9, lines 23-24; p. 10, lines 1-10.

[20] MCC's Jan. 8, 2015 Transcript, at p. 10, lines 11-13.

**THE PETITIONERS' COUNSEL TO THE MCC:** Right, and we appreciate that.[21] . . .

**MCC MEMBER TO MCC CHAIRMAN:** I feel that we've got the information we need. I have no further questions. So, it does strike me that a real good procedure for closing the—for making sure that we're going to be deciding next week is that we just close it. That sounds good to me. If that's— that process would work correctly, right? We could close tonight as he described?[22] . . .

**MCC CHAIRMAN TO MCC MEMBER:** You want to close it off?[23]

**MCC MEMBER TO MCC CHAIRMAN:** Close it tonight and have a decision ready by the next meeting.[24] . . .

**MR. MCMANUS TO THE MCC:** [Y]ou have all the information you need, and if I get what you're saying, and absorb all of this for a decision at the next meeting[.][25] . . .

**MCC CHAIRMAN TO MR. MCMANUS:** Well, that was supposed to be the design, that tonight we would have all the information we needed to make a decision and we would think about it and make a decision on January 22[, 2015].[26] . . .

---

[21] MCC's Jan. 8, 2015 Transcript, at p. 10, lines 14-15.

[22] MCC's Jan. 8, 2015 Transcript, at p. 11, lines 2-9.

[23] MCC's Jan. 8, 2015 Transcript, at p. 11, lines 10-11.

[24] MCC's Jan. 8, 2015 Transcript, at p. 11, lines 12-13.

[25] MCC's Jan. 8, 2015 Transcript, at p. 11, lines 19-22.

[26] MCC's Jan. 8, 2015 Transcript, at p. 11, lines 23-24; p. 12, lines 1-3.

**MR. MCMANUS TO THE MCC:**    I mean, if you want my . . .

recommendation, I think you should close with the statement that you have all the

information you need and there should be no information forthcoming, that you

go over all the information that you have in front of you right now to render a

decision on the [January 22, 2015].[27] . . .

**MCC CHAIRMAN TO MR. MCMANUS:**    You want us to close it, huh,

tonight?[28]

**MR. MCMANUS TO THE MCC:**    I think that you should—if, you know, if

you want to go with my suggestion that you vote to close the hearing and . . .

issue a decision on [January 22, 2015], that would be my suggestion.[29]

**MCC CHAIRMAN TO MCC MEMBERS:**    How do you feel about

that?[30]

**MCC MEMBER No. 1:**    That seems reasonable.[31]

**MCC MEMBER No. 2:**    I agree.[32]

**MCC CHAIRMAN TO MR. MCMANUS:**    I guess you've got—

everybody agrees with you.[33] . . .

**THE PETITIONERS' COUNSEL TO THE MCC:**    [J]ust by a point of

---

[27] MCC's Jan. 8, 2015 Transcript, at p. 12, lines 3-12.

[28] MCC's Jan. 8, 2015 Transcript, at p. 19, lines 3-4.

[29] MCC's Jan. 8, 2015 Transcript, at p. 19, lines 5-9.

[30] MCC's Jan. 8, 2015 Transcript, at p. 19, line 10.

[31] MCC's Jan. 8, 2015 Transcript, at p. 19, lines 11-12.

[32] MCC's Jan. 8, 2015 Transcript, at p. 19, line 13.

[33] MCC's Jan. 8, 2015 Transcript, at p. 19, lines 14-16.

order to make sure—if I understand what the board is going to do is close the

hearing-- . . . and then deliberate at your subsequent hearing.[34]

**MCC CHAIRMAN TO MR. MCMANUS**: Yeah, and we'll come back

on [January 22, 2015].[35] . . .

**THE PETITIONERS' COUNSEL TO THE MCC**: [W]hat the law

provides is that the evidentiary phase of the hearing closes and then you have

twenty-one days within which to issue your decision.[36]

**MCC MEMBER TO MR. MCMANUS**: Right, right.[37]

**THE PETITIONERS' COUNSEL TO THE MCC**: And I think that it

would be important for all the parties here to understand clearly that if the hearing

is closed, then there's no other submissions by anybody.[38]

**MCC MEMBER TO MR. MCMANUS**: Yes.[39] . . .

**MR. MCMANUS TO THE MCC**: If the hearing is closed, then it's closed,

and that's it.[40] . . .

**MCC CHAIRMAN TO MCC MEMBERS**: Someone want to make a

motion?[41]

---

[34] MCC's Jan. 8, 2015 Transcript, at p. 19, lines 19-22, line 24; p. 20, line 1.

[35] MCC's Jan. 8, 2015 Transcript, at p. 20, lines 2-3.

[36] MCC's Jan. 8, 2015 Transcript, at p. 20, lines 5-8.

[37] MCC's Jan. 8, 2015 Transcript, at p. 20, line 9.

[38] MCC's Jan. 8, 2015 Transcript, at p. 20, lines 10-13.

[39] MCC's Jan. 8, 2015 Transcript, at p. 20, line 14.

[40] MCC's Jan. 8, 2015 Transcript, at p. 21, lines 9-10.

[41] MCC's Jan. 8, 2015 Transcript, at p. 21, lines 19-20.

**MCC MEMBER No. 1:**     I so move.[42]

**MCC MEMBER No. 2:**     That's the easy way to do it. I second.[43]

**MCC CHAIRMAN TO MCC MEMBERS:**     Yeah. All in favor, say yes.[44]

**(AFFIRMATIVE RESPONSES BY MCC MEMBERS)**[45]

**MCC CHAIRMAN TO MCC MEMBERS:**     Yes, yes. Okay. Thank you, guys.[46]

**THE PETITIONERS' COUNSEL TO THE MCC:**     Thank you very much.[47] . . .

The agenda, transcript, and minutes of the MCC's January 22, 2015 meeting at which it voted to deny the proposed Project provide further proof that the MCC closed its public hearing on the Petitioners' NOI on January 8, 2015 and not on January 22, 2015.[48]

The agenda of the MCC's January 22nd meeting states that the MCC's "Hearing [on the proposed Project] closed on 1/8/2015 with a final determination to be rendered [by the MCC on] 1/22/2015."[49] This is confirmed by the transcript of the MCC's January 22nd meeting at which the MCC's Chairman stated that "[t]he [MCC's] hearing [on the original proposed Project]

---

[42] MCC's Jan. 8, 2015 Transcript, at p. 21, line 21.

[43] MCC's Jan. 8, 2015 Transcript, at p. 21, lines 22-23.

[44] MCC's Jan. 8, 2015 Transcript, at p. 21, line 24; p. 22, line 1.

[45] MCC's Jan. 8, 2015 Transcript, at p. 22, line 2.

[46] MCC's Jan. 8, 2015 Transcript, at p. 22, lines 3-4.

[47] MCC's Jan. 8, 2015 Transcript, at p. 22, line 5.

[48] A copy of the MCC's Agenda for the MCC's January 22, 2015 meeting is attached as Exhibit 5 to Mr. Haney's PFT; a copy the Transcript of MCC's January 22, 2015 meeting ("MCC's Jan. 22, 2015 Transcript") is attached as Exhibit 2 to Mr. Haney's PFT; and the minutes of the meeting are attached to his PFT as Exhibit 6.

[49] Exhibit 5 to Mr. Haney's PFT.

closed on January 8th, with a final determination [by the MCC] on this application to be decided [at the MCC's January 22nd meeting]," and as such, "there [would] be no submissions [on the Project] by the audience [at the January 22nd meeting]."[50] These comments of the MCC's Chairman are further confirmed by the minutes of the MCC's January 22nd meeting. The minutes note that the MCC's Chairman stated at the January 22nd meeting that the MCC's Conservation Agent, Mr. McManus "[would] be providing his comments [on the original proposed Project] and the [MCC members] [would then] give their comments and then . . . [take] a vote" on approving or denying the Project.[51] The minutes also note that "[f]ollowing his review [of the original proposed Project at the January 22nd meeting], the [MCC's] Agent [(Mr. McManus)] recommended [that the MCC] den[y] the [Project] . . . without prejudice" and that the MCC accepted his recommendation by voting unanimously to deny the Project without prejudice.[52] The MCC, however, did not issue its written Order of Conditions pursuant to the MWPA and 310 CMR 10.05(6)(a) denying the proposed Project until February 11, 2015, 34 days after the MCC closed its public hearing on the Petitioners' NOI for the Project on January 8, 2015 and 13 days after expiration of the January 29, 2015 deadline for the MCC to issue its written Order of Conditions denying the Project.

Notwithstanding the highly persuasive evidence discussed above demonstrating that the MCC's Order of Conditions denying the original proposed Project was untimely under the MWPA and 310 CMR 10.05(6)(a), the MCC and the Intervenors contended at the Adjudicatory Hearing that the Order was timely because in their view the required public hearing that a local

---

[50] MCC Jan. 22, 2015 Transcript, a p. 2, lines 12-16.

[51] Exhibit 6 to Mr. Haney's PFT (p. 3).

[52] Id.

Conservation Commission is to conduct on an NOI is a bifurcated proceeding consisting of an "evidentiary phase" and a "deliberative phase," and, as such, the 21 day deadline for the Commission to issue its Order of Conditions begins to run after the "deliberative phase." Hence, under their reading of the MWPA and 310 CMR 10.05(6)(a), the MCC's February 11, 2015 Order of Conditions was timely because the 21 day period did not begin to run on January 8, 2015, when the MCC closed the "evidentiary phase" of its public hearing on the Petitioners' NOI for the original proposed Project, but rather on January 22, 2015, when the MCC voted to deny the Project. MCC's Pre-Hearing Memorandum, at p. 10. The problem with the MCC's and the Intervenors' position is that neither the MWPA nor the Wetlands Regulations contain any provisions stating that the local Conservation Commission's public hearing on an NOI is a bifurcated proceeding consisting of an "evidentiary phase" and a "deliberative phase," and that the 21 day deadline for the Commission to issue its Order of Conditions begins to run after the "deliberative phase." As the SJC ruled in <u>Oyster Creek</u>, "the timing provisions in the [MWPA] are obligatory, and a local community is not free to expand or ignore them." Accordingly, the MCC's reliance <u>Kurlander v. School Committee of Williamstown</u>, 16 Mass. App. Ct. 350 (1983), a case involving a different statutory scheme governing the termination of public school teachers is unavailing.

Moreover, the evidence introduced at the Adjudicatory Hearing as set forth above at pp. 19-26 does not support the MCC's and the Intervenors' contention that on January 8, 2015 the Petitioners' consented to an extension of the MCC's 21 day deadline to issue its Order of Conditions on the Petitioners' NOI for the proposed Project. Indeed, on cross-examination by the Petitioners' counsel at the Hearing, the MCC's Conservation Agent, Mr. McManus, admitted that at the MCC's January 8, 2015 public hearing on the Petitioners' NOI, the Petitioners neither

requested a continuance of the public hearing nor consented to a continuance of the public hearing in accordance with 310 CMR 10.05(b) as discussed above, at p. 18. Adjudicatory Hearing Transcript ("AHT"), at p. 227, lines 12-18; p. 228, lines 5-12. Mr. McManus' admission is highly probative evidence demonstrating that the MCC's public hearing on the Petitioners' NOI closed on January 8, 2015, making January 29, 2015 the 21 day deadline under the MWPA and 310 CMR 10.05(6)(a) for the MCC to issue an Order of Conditions on the Petitioners' original proposed Project. While it is undisputed that the MCC met on January 22, 2015 and voted to deny the Petitioners' original proposed Project, the MCC did not issue its Order of Conditions confirming its denial until February 11, 2015, which was after the January 29, 2015 deadline.

In sum, the Petitioners' appeal of the SOC was not barred at the time of the appeal's filing, and, as such, the case may proceed to the next issue for resolution: whether the Petitioners' Revised Project Plan can be reviewed and approved in this appeal pursuant to the Department's Plan Change Policy.

III. **THE PETITIONERS' REVISED PROJECT PLAN CANNOT BE REVIEWED AND APPROVED IN THIS APPEAL PURSUANT TO THE DEPARTMENT'S PLAN CHANGE POLICY BECAUSE THE PETITIONERS' PROPOSED STEEL BRIDGE ALTERNATIVE IS SUBSTANTIALLY DIFFERENT FROM THEIR ORIGINALLY PROPOSED TIMBER BRIDGE AND INCREASES IMPACTS TO SALT MARSH AND LAND CONTAINING SHELLFISH.**

A. <u>The Requirements of the Department's Plan Change Policy</u>

The Department's Plan Change Policy provides that:

> [t]he primary purpose of th[e] policy is to promote the intent of the [MWPA], to ensure thorough local review of work proposed in or near wetland resource areas by identifying those circumstances in which the Department will consider changes to plans filed under [NOIs] which are before the Department under appeal for [an SOC] or for which [an administrative appeal] has been filed. . . .

Department's Plan Change Policy, ¶ 1. "This policy specifically distinguishes those plan

changes which are substantial, and will require a new NOI filing [with the local Conservation Commission], from those plan changes which are deemed insubstantial and thus may be considered as part of the appeal review process." Id. The Policy specifically precludes "[t]he Department [from] . . . considering plan changes, . . . which are deemed to be substantially different from the plan acted upon by the [local] Conservation Commission and which are referenced in the Order of Conditions. Substantial plan changes are deemed to be those changes [1] which significantly modify the project configuration and [2] which result in increased impacts to wetland resource areas. . . ." Id., ¶ 5 (numerical references supplied).

Under the Policy "[t]he Department may consider plans which contain insubstantial changes from the plans acted upon by the Conservation Commission and referenced in the Order of Conditions. Insubstantial plan changes are limited to those changes which involve unchanged or decreased impacts but which do not constitute significant changes from the project configuration acted upon by the Conservation Commission . . . ." Id., ¶ 6. "[T]he burden is on the project proponent to demonstrate that the plan change is insubstantial. Specifically, the project proponent must show that the plan change results in [1] an unchanged, or not significantly changed, project configuration and [2] unchanged or decreased impact to any wetland resource areas as compared to the plan acted upon by the Conservation Commission and referenced in the Order of Conditions." Id., ¶ 7 (numerical references supplied).

As discussed below at pp. 30-50, the Petitioners failed to meet their burden under the Department's Plan Change Policy of demonstrating that their proposed steel bridge alternative: (1) is not substantially different from their originally proposed timber bridge and (2) will not increase impacts to any wetlands resources. A preponderance of the evidence at the Adjudicatory Hearing demonstrated that the steel bridge is substantially different than the timber

bridge and increases wetlands impacts to Salt Marsh and Land Containing Shellfish.

Accordingly, the Petitioners' Revised Project Plan cannot be reviewed and approved in this

appeal, but must be submitted to the MCC for review pursuant to a new NOI.[53]

### B. The Petitioners' Proposed Steel Bridge Alternative Is Substantially Different From Their Originally Proposed Timber Bridge.

#### 1. Mr. Bunker's Testimony on behalf of the Petitioners

At the Hearing, the Petitioners' witness, Mr. Bunker, testified that construction of

Petitioners' proposed steel bridge would not be substantially different from construction of the

Petitioners' originally proposed timber bridge. His testimony was based on his experience as a

licensed Professional Land Surveyor. Mr. Bunker's PFT, ¶ 1. He holds a Bachelor of Science

degree in Forestry Engineering from the University of Maine at Orono (1977) and a Master of

Landscape Architecture degree from the Harvard University Graduate School of Design (1987).

Id., ¶ 3. He has provided project design and review services for a number of residential and

commercial projects and has more than 25 years of experience in permitting projects near

wetlands areas. Id., ¶¶ 4-5.

Mr. Bunker testified that the Petitioners' steel bridge alternative will be a pre-fabricated

steel truss design consisting of three spans: (1) the Mashpee Mainland span; (2) the middle span;

and (3) the Gooseberry Island span having the following configurations. Id., ¶ 24.

> (1)   The Mashpee Mainland span. This span will be 50 feet and supported
> by a concrete abutment at the end of Punkhorn Point Road and the first
> pile bent, which will be in the intertidal zone between the Mashpee
> Mainland Salt Marsh and the low water line. Id. The height of this span
> will vary from 3.0 feet to 6.0 feet above the Salt Marsh (5.2 feet to 8.2

---

[53] As a result of my ruling that the Petitioners' Revised Project Plan cannot be reviewed and approved in this appeal, the MCC's and the Intervenors' pending "Joint Motion to Strike Section 3 of [the] Petitioners' Post-Hearing Memorandum" because it purportedly "seeks to introduce, for the first time [and after the close of the Adjudicatory Hearing], an entirely new mitigation proposal [for the Petitioners' steel bridge alternative]," is denied as moot.

feet clear from the Salt Marsh to the bottom of the grating) and no piles will be in the Salt Marsh. Id.

    (2)    The Middle span. This span will be 60 feet and supported by the two pile bents. Id. This span is entirely above the intertidal zone and open water, none is over Salt Marsh. Id.

    (3)    The Gooseberry Island span. This span will be 90 feet and similar to the Mashpee Mainland span that will be supported by a pile bent in the intertidal zone and a concrete abutment on upland, and will span over Salt Marsh. Id. The height of this span will vary from 3.8 feet to 8.4 feet above the Salt Marsh (6.0 feet to 10.6 feet clear from the Salt Marsh to the bottom of the grating) and no piles will be in the Salt Marsh. Id.

Mr. Bunker testified that the steel bridge will have railings along its two sides that will be steel trusses providing the longitudinal strength to support the bridge across its three spans. Id. Every ten feet of the structure will have a cross beam connecting the structure's two trusses and carrying longitudinal beams which, in turn, will support the steel grating driving surface. Id. The driving surface will be composed of two strips of 3.5 feet wide, 2 inches high steel grating with a manufacturer-claimed 82% light penetration, separated by 2.0 feet wide open space. Id. There will be 2 feet, 2 inches from the bottom of the truss structure to the bottom of the steel grating. Id. It will be supported on the landward ends by concrete abutments. Id. The spanning sections will be supported by two bents of nine 14 inch piles each, located in the inter-tidal zone. Id.

Mr. Bunker testified that "[t]he construction methodology for [this] alternative steel bridge will be substantially the same as that of the [originally proposed] timber pile supported structure . . . ." Id., ¶ 25. He testified that with the exception of the change of the bridge's design from timber to steel, it is substantially the same size, length, and width of the original timber structure and in substantially the same location. Id., ¶ 27. However, on cross-

examination at the Adjudicatory Hearing, Mr. Bunker admitted that the steel bridge will be

50% wider. AHT, p. 56, lines 10-24; p. 57, lines 1-24; p. 58, lines 1-24; p. 59, lines 1-5.

### 2. Mr. Bartow's Testimony on behalf of the Department

Mr. Bartow is an Environmental Analyst in the Wetlands and Waterways Program in the

Department's Southeast Regional Office with nearly 30 years of experience in the environmental

field, 11 of which are in the wetlands permitting area: two years in the private sector and nine

years (since 2008) with the Department. Pre-filed Testimony of Mark Bartow ("Mr. Bartow's

PFT"), ¶ 1; Exhibit 1 to Mr. Bartow's PFT. He holds a Bachelor of Science degree in

Environmental Science (1990) and a Master of Science degree in Plant and Soil Sciences (2000)

from the University of Massachusetts at Amherst. Exhibit 1 to Mr. Bartow's PFT. His duties at

the Department include reviewing NOIs pursuant to the MWPA and the Wetlands Regulations,

conducting site inspections, preparing SOCs and enforcement documents, investigating

complaints, providing technical compliance assistance, and testifying on behalf of the

Department at Adjudicatory Hearings. Mr. Bartow's PFT, ¶ 1.

At the Adjudicatory Hearing Mr. Bartow agreed with Mr. Bunker's testimony that the

Petitioners' steel bridge alternative will not be substantially different from the Petitioners'

originally proposed timber bridge. He testified that "[t]he plan change as proposed by the

petitioner[s] . . . is substantially the same" as the Petitioners' originally proposed timber

bridge. Mr. Bartow's PFT, ¶ 22. Mr. Bartow, however, did not provide a detailed explanation

for his opinion.

### 3. Mr. Daylor's Testimony on Behalf of the Intervenor Wolpe, Atkins, and Weltman Group

I do not find persuasive Mr. Bunker's and Mr. Bartow's testimony that construction of

the Petitioners' proposed steel bridge will not be substantially different from the Petitioners'

originally proposed timber bridge because, while their professional credentials are noteworthy, neither Mr. Bunker nor Mr. Bartow is a civil or construction engineer.[54] As a result, their testimony regarding the structural and engineering details of the proposed steel bridge did not carry as much weight as the testimony of Mr. Daylor, a Professional Engineer with substantial civil and construction engineering experience, especially in the environmental field, who testified on behalf of the Intervenor Wolpe, Atkins, and Weltman Group. Mr. Daylor's testimony effectively refuted Mr. Bunker's and Mr. Bartow's testimony by demonstrating that the Petitioners' steel bridge alternative is substantially different from their originally proposed timber bridge.

Mr. Daylor is a Professional Engineer with over 50 years of experience in environmental and land development planning, design, and construction, including work on hundreds of projects involving the protection of wetlands and coastal resources. Pre-filed Direct Testimony of Robert F. Daylor, PE, PLS ("Mr. Daylor's PFT"), ¶¶ 1-4.[55] As a Massachusetts Professional Engineer, Mr. Daylor is licensed by the Commonwealth's Board of Registration of Professional Engineers and Professional Land Surveyors ("the Board") and, as such, his expert testimony at the Adjudicatory Hearing comparing the engineering design and construction impacts of the Petitioners' proposed steel bridge alternative to the Petitioners' originally proposed timber bridge is subject to the Board's vigorous licensing and engineering practice requirements and carried great weight at the Hearing. http://www.mass.gov/ocabr/licensee/dpl-boards/en/about-the-board.html; Sunset City, supra, 2017 MA ENV LEXIS 35, at 29. He has been qualified as an

---

[54] AHT, p. 41, lines 10-14; p. 247, lines 12-24; p. 248, lines 1-16; p. 256, lines 4-12.

[55] In addition to being a Professional Engineer, Mr. Daylor is also a Professional Land Surveyor. Mr. Daylor's PFT, ¶¶ 1-2. He holds a Bachelor of Science in Civil Engineering degree and a Master of Science in Civil Engineering degree with an environmental engineering focus, from Northeastern University in Boston, and studied at Harvard University's Graduate School of Design as a post graduate Loeb Fellow in Advanced Environmental Studies. Id.

expert witness in land development issues, hydrology, drainage design, stormwater management, and wetlands protection and mitigation issues in Massachusetts Superior Court, Massachusetts Land Court, the United States District Court for the District of Massachusetts, and the Massachusetts Appellate Tax Board. Mr. Daylor's PFT, ¶ 6. He has testified in many Adjudicatory Hearings involving Wetlands and Tidelands (c. 91) permit appeals, and has testified on behalf of project proponents or opponents in court litigation or administrative appeals, including on behalf of public sector clients such as the Commonwealth. Id.

Here, Mr. Daylor testified that "[t]he [Petitioners'] revised proposal . . . to use a pre-fabricated steel truss bridge with spans of 50 feet, 60 feet and 90 feet and intermediate piers located in the beach resource area of the intertidal zone of the arm of the Popponesset Bay separating Punkhorn Point [from] Gooseberry Island . . . will cause increased [wetlands] resource damage both during construction and as a result of the finished bridge itself. Id., ¶ 12. He testified that "one example of the increased, adverse impacts from the completed, new bridge, [is that] both the revised Punkhorn Point abutment and the approach to it have been enlarged, with resultantly greater negative impacts on protected [wetlands] resource areas." Id. He testified that "Sheet two of the truss bridge is significantly heavier than the [original] timber bridge proposal[,] . . . with significantly longer spans the loads transferred to the end abutments (and intermediate piers) are significantly larger than the 14 foot timber spans," and, accordingly, "the concrete abutment and concrete approach wing walls are significantly larger." Id.

Mr. Daylor refuted Mr. Bunker's testimony that "[t]he construction methodology [for the steel bridge] will be substantially the same as that of the [original] timber pile supported structure . . . ." Id., ¶ 13. He testified that "[w]hile there are several manufacturers of prefabricated steel truss bridges which can be assembled and erected at the site, that construction

methodology [for such a bridge] is 'not substantially the same' as timber short-span construction." Id. He based his opinion on US Army Field Manual FM 5-277, which he testified "is the commonly used manual for the construction of the type of [steel] bridge [that the Petitioners are] now proposing." Id. Based on this Manual, Mr. Daylor testified that "[w]hile it is theoretically possible to assemble and construct the bridge from one end using a cantilever launching technique, manpower and light construction equipment, nothing in the [project] site allows such a technique for [a number of] reasons." Id.

First, according to Mr. Daylor, "[a] single truss bay (a ten foot long section) without the deck weigh[s] 5,520 [pounds] and requires a launching nose bay which weigh[s] 2,000 [pounds]." Id., ¶ 13.1. He testified that "[t]he decking and diagonal bracing adds another 3,600 [pounds] per panel," and "[a] single, completed 10 foot long bay weights over 4.5 tons which is significantly heavier that the 14 foot timber span." Id.[56]

Second, Mr. Daylor testified that US Army Field Manual FM 5-277 "recommends [that] the approach 'should be two lanes and straight for 150 feet'" and that the Petitioners' proposed construction of the steel bridge fails to meet this standard because "Punkhorn Point Road is only two rods wide (33 feet) and consists of a single 10-12 foot wide track," and as a result, "[t]here is simply no room . . . to get a straight run to assemble and cantilever launch the bridge." Id.,

---

[56] In his rebuttal testimony, Mr. Bunker contended that Mr. Daylor had overestimated the weight of the various structural components of the proposed steel bridge by approximately 50% based on Mr. Bunker's purported review of the manufacturer specifications for the steel bridge that the Petitioners propose to build. Rebuttal Testimony of Thomas J. Bunker, PLS ("Mr. Bunker's Rebuttal PFT"), ¶ 2. Mr. Bunker, however, did not refute Mr. Daylor's testimony that the steel bridge will be "significantly heavier" than the originally proposed timber bridge. On cross-examination at the Adjudicatory Hearing, Mr. Bunker admitted that he did not perform any analysis of the weight differential between the originally proposed timber bridge and the proposed steel bridge alternative. AHT, p. 58, lines 20-24. I also credit and accord Mr. Daylor's testimony more weight than Mr. Bunker's testimony because as noted above in the text, Mr. Bunker is not a civil or construction engineer while Mr. Daylor is a Professional Engineer with over 50 years of experience in environmental and land development planning, design, and construction, including work on hundreds of projects involving the protection of wetlands and coastal resources. Mr. Daylor's PFT, ¶ 4.

¶ 13.2.[57]

Third, Mr. Daylor testified that US Army Field Manual FM 5-277 provides that "[i]f the

bridging is to be unloaded and stacked at the site - the site must be about 150 feet wide." Id.,

¶ 13.3. He testified that "[t]here is no place on Punkhorn Point which could be made 150 feet

wide without clearing on private property for over [100] feet and quite possibly encroaching

upon protected wildlife habitat in an adjacent isolated wetland." Id. He stated that the 150 feet

width is necessary because US Army Field Manual FM 5-277 provides that the steel bridge must

be constructed as follows:

> [E]ach bridge bay (10 foot long section) has to be assembled and connected to the
> adjacent bay. Then the first bay is set on rollers on the new abutment and rolled
> out in a "launching nose frame." Then the third bay is connected to the second,
> etc. and the bridge is slowly pushed out towards the first pier[,] but there always
> has to be a cantilevered section of the assembled bridge which is on the landward
> side of the rollers which counterbalances the elevated portion of the bridge. The
> space for the counterbalance has to be level with the bridge, and aligned straight
> with the bridge.

Id., ¶ 13.4. Mr. Daylor testified that with respect to the Petitioners' proposed steel bridge "[t]he

bare assembly (the three forward bays in the launch nose have no decks to save weight) for a 50

foot span requires a straight assembled bridge of a length of 80 feet (30 feet counterweighted

over the land) and weighs 17.5 tons." Id. He testified that "[t]here is no place on the project site

which allows this alignment," and that "the [Petitioners'] proposed [steel] bridge has a 10%

---

[57] At the Hearing, Mr. Bunker did not dispute Mr. Daylor's testimony that US Army Field Manual FM 5-277
"recommends [that] the approach 'should be two lanes and straight for 150 feet,'" but attempted to undercut or
minimize the value of this important engineering standard by contending that the standard "is presumably the
optimal condition under which [the steel bridge] can be constructed, but by no means a requirement." Mr. Bunker's
Rebuttal PFT, ¶ 3. Mr. Bunker also contended that there is enough room at the project site to construct the steel
bridge because in his opinion the bridge can be built in 10 foot long bays, which would be added to the total
assembly one at a time from the mainland side as the structure is pushed (or pulled) toward Gooseberry Island, and
that by using this construction methodology, only 12 to 15 feet of work area will be necessary to construct the
bridge. Id. However, Mr. Bunker did not explain how this construction work could be done without the barge
delivering the bridge sections touching the bottom of the shellfish habitat that is part of the Intervenor Mashpee
Wampanoag Tribe's shellfish grant. Mr. Bunker's testimony on these engineering aspects of the proposed steel
bridge is also not persuasive given that he is not a civil or construction engineer while Mr. Daylor is such an
engineer and I credit his testimony over Mr. Bunker's testimony for the reasons set forth above in the text.

grade which may be impossible to launch using this accepted technique because the counterweight section has to be level with the elevated bridge." Id.

Mr. Daylor testified that "[s]ince, in [his] professional opinion, the [project] site cannot accommodate an assembly and launch from Punkhorn Point as Mr. Bunker testifie[d], the only alternative is to assemble the [steel bridge] spans elsewhere, barge them to the site and then erect them at the site by a large barge-mounted crane." Mr. Daylor's PFT, ¶ 14. He testified that alternative construction would "rais[e] a significant risk to land containing shellfish resources from the heavy barge grounding out in the shallow creek" because "[t]he three assembled bridge spans [would] weigh 45,600 [pounds] (22.8 tons), 54,720 [pounds] (27.4 tons), and 82,080 [pounds] (41 tons) respectively," and "would most likely require both a heavy crane barge and a second barge carrying the assembled bridge sections." Id. He testified that the Petitioners presented "no evidence . . . that these barges could even fit in the creek" and no evidence "of the impacts of such an approach on coastal resources." Id. He testified that the Petitioners' evidence "is completely silent on construction impacts except to [contend that the steel bridge] would be constructed just like the timber bridge," which in "[his] opinion . . . is an impossibility." Id., ¶ 15.

### C. The Petitioners' Proposed Steel Bridge Alternative Will Increase Wetlands Impacts to Salt Marsh and Land Containing Shellfish.

#### 1. Mr. Bunker's and Mr. Forns' Testimony on behalf of the Petitioners

##### a. Mr. Bunker's Testimony

Mr. Bunker testified that as a result of the Department's denial of the original proposed Project for failing to meet the Performance Standards for work in Salt Marsh as set forth in 310 CMR 10.32, the Petitioners addressed the Department's concerns by changing the bridge's design from a timber bridge to a structure built entirely of steel. Mr. Bunker's PFT, ¶ 23. He

testified that the new design addressed the Department's concerns because "[a] steel structure [bridge] allows for a greater span between supports and thereby enables the Petitioners to propose a design with no piles in the Salt Marsh," and "[i]n addition, the steel structure presents less of a profile and thereby allows greater light penetration" to the Salt Marsh. Id. The Petitioners' other expert witness, Mr. Forns, agreed with Mr. Bunker's testimony.

### b. Mr. Forns' Testimony

Mr. Forns is a Senior Environmental Scientist and principal of Applied Marine Ecological Lab ("AMEL"), an environmental consulting firm based in Falmouth, Massachusetts. Pre-filed Direct Testimony of Joseph M. Forns ("Mr. Forns'") PFT, ¶ 1. He holds a Bachelor of Science degree from Villanova University in Villanova, Pennsylvania (1966). Exhibit A to Mr. Forns' PFT. For nearly 40 years (since 1978), he has provided consulting and support services to various entities, including government agencies, industry, and private organizations on projects involving marine pollution and ecological issues. Id., ¶ 1. He has extensive experience in wetlands and marine resource assessments, multivariate ecological investigations, aquaculture projects, oil and hazardous materials analyses, geotechnical groundwater contamination evaluations, and coastal marine process design engineering. Id., ¶ 2.

Mr. Forns testified that he is knowledgeable of the environmental conditions at the Property as a result of having reviewed the Petitioners' NOI for the original proposed Project, Original Project Plan, and Revised Project Plan, and conducting an environmental assessment of the site with particular emphasis on the Salt Marsh habitats that the Department identified in its SOC denying the original proposed Project. Id., PFT, ¶ 3. He testified that the Revised Project Plan directly addresses the impacts to Salt Marsh and potential shading impacts to Salt Marsh

habitat that the Department identified in its SOC denying the original proposed Project based on the timber bridge design. Id., ¶ 4.

Mr. Forns testified that "[a]ny realistic evaluation of potential adverse impacts [to Salt Marsh] due to diminished sunlight . . . needs to incorporate the overall health of the [Salt Marsh] system as a whole, as well as any incidental shading." Id., ¶ 15. He opined that "[g]iven the open spaced deck surface, separation of steel grated decking, and the elevation of the decking above the marsh surface, it is unlikely there will be any measurable destruction of salt marsh habitat or adverse impact to the underlying marsh surfaces or overall salt marsh system (1.5 acres on the island and 100+/- acres on the mainland)." Id. However, while contending that the decking on the steel bridge alternative will allow for greater light penetration to the Salt Marsh than the originally proposed timber bridge, Mr. Forns admitted on cross-examination at the Adjudicatory Hearing that the "bridge decking [for the steel bridge] doesn't differ" from the decking for the timber bridge. AHT, p. 102, lines 15-23.

Mr. Forns testified that "[the] [m]itigation proposed [by the Petitioners] for any potential impacts resulting from this project on all associated resource areas will enhance the vitality of this salt marsh system," and that the "[t]ransplanting and relocation of salt marsh plants to identified disturbed areas as identified in the [Petitioners' mitigation plan] will result in no net losses to the existing indigenous salt marsh habitat and will actually increase the overall area of viable and productive salt marsh habitat." Id., ¶ 17. He testified that the Petitioners' steel bridge alternative will not destroy any Salt Marsh as the Department had previously concluded regarding the originally proposed timber bridge because "the [steel] structure [alternative] allows for the spanning of the Salt Marsh and eliminates all piles from the Salt marsh." Id., ¶ 19. However, on cross-examination at the Adjudicatory Hearing, he admitted that the proposed steel

bridge will span over Land Containing Shellfish and the Intervenor Mashpee Wampanoag

Tribe's shellfish grant area. AHT, p. 113, lines 8-10.

Mr. Forns attempted to minimize the steel bridge's impacts to Land Containing Shellfish

by testifying that "this portion of Popponesset Bay is closed to shellfishing" and that "[he] found

no measurable quantities of shellfish [exist] within the project site." Mr. Forns' PFT, ¶ 8. As

discussed below, Mr. Forns' testimony was effectively refuted by Mr. Daylor's and Ms. Ball's

testimony.

### 2.    Mr. Bartow's Testimony on behalf of the Department

Mr. Bartow agreed with Mr. Bunker's and Mr. Forns' testimony that the Petitioners'

proposed steel bridge alternative will decrease impacts to protected wetlands areas at the Project

site. Specifically, he testified that the Petitioners' Revised Project Plan meets the Performance

Standards for work in Salt Marsh at 310 CMR 10.32 because the Plan's proposed steel bridge:

"(a) . . . eliminates pilings in [S]alt Marsh and (b) is an open grate design which minimizes

shading." Mr. Bartow's PFT, ¶ 21. He testified that "[t]he open grate design reportedly will

allow greater than 50% light penetration to the salt marsh vegetation below [the structure]," and

"that the revised design would not result in any adverse effects to the salt marsh." Id.

Mr. Bartow also testified that construction of the Petitioners' steel bridge would also

satisfy the Wetlands Regulations' Performance Standards for two other protected wetlands areas:

Land Containing Shellfish and Coastal Beach/Tidal Flat. Id., ¶¶ 23-24. With respect to Land

Containing Shellfish, he testified that the Petitioners' steel bridge alternative "would meet the

performance standards for [work in] Land Containing Shellfish [because] the petitioner[s]

propos[e] to remove and relocate any individual shellfish in the area of the proposed piles and

because [this protected wetlands area] would be returned substantially to its former productivity

in less than one year from commencement [of work] in accordance with 310 CMR 10.34(5)."
Id., PFT, ¶ 23.[58] With respect to Coastal Beach/Tidal flat, he testified that that the Petitioners'
steel bridge alternative "would meet the performance standards for [this protected wetlands area
as set forth] at 310 CMR 10.27(3) and 10.27(6)" because "the [bridge's] pilings located in [that
area as] shown on the Revised Plan . . . would not have an adverse effect on [that] . . . area . . .
based on [his] observations . . . at the time of [his] site inspection and [his] experience." Id.,
¶ 24. He testified that "[he] believe[s] the area is a low energy environment," that "[he] [neither]
observe[d] any evidence of erosion, scour, or sedimentation," nor "observe[d] any strong current
or tidal action in the vicinity of the project." Id. He testified "that any affects created by the
[bridge's] pilings would be negligible and small enough to be disregarded as defined at 310
CMR 10.23 under Adverse Effect." Id.

Lastly, Mr. Bartow opined that that the Petitioners' proposed steel bridge alternative will
not adversely affect Salt Marsh, Land Containing Shellfish, and Coastal Beach/Tidal Flat based
on his August 27, 2015 "observ[ation] [of] a steel grate bridge in Barnstable[, Massachusetts] of
a design similar to that [of the Petitioners'] proposed [steel bridge as depicted] in the
[Petitioners'] Revised [Project] Plan." Id., ¶ 25. He testified that "[t]he bridge crosses an
intermittent stream and Bordering Vegetated Wetland[s] surrounded by mature trees," and that
"[b]ased on [his] observations, [he] believe[s] that the bridge is not adversely impacting the
[protected wetlands] resource areas that it spanned." Id.

3.      **Mr. Daylor's Testimony on Behalf of the Intervenor
        Wolpe, Atkins, and Weltman Group and
        Ms. Ball's Testimony on Behalf of the
        Intervenor Mashpee Wampanoag Tribe Group**

---

[58] Mr. Bartow testified as such even though, as Ms. Ball noted in her testimony, the Intervenor Mashpee
Wampanoag Tribe has an exclusive shellfish grant in the area.

I do not find persuasive Mr. Bunker's, Mr. Forns', and Mr. Bartow's testimony that the Petitioners' proposed steel bridge alternative will decrease impacts to wetlands areas at the Project site because their testimony was effectively refuted by Mr. Daylor's testimony on behalf of the Intervenor Wolpe, Atkins, and Weltman Group and Ms. Ball's testimony on behalf of the Intervenor Mashpee Wampanoag Tribe Group. Mr. Daylor's and Ms. Ball's testimony demonstrated that construction of the steel bridge will increase impacts to Salt Marsh and Land Containing Shellfish.

### a. Mr. Daylor's Testimony

As noted previously, Mr. Daylor testified that "[t]he [Petitioners'] revised proposal . . . to use a pre-fabricated steel truss bridge with spans of 50 feet, 60 feet and 90 feet and intermediate piers located in the beach resource area of the intertidal zone of the arm of the Popponesset Bay separating Punkhorn Point [from] Gooseberry Island . . . will cause increased [wetlands] resource damage both during construction and as a result of the finished bridge itself. Mr. Daylor's PFT, ¶ 12. He testified that "one example of the increased, adverse impacts from the completed, new bridge, [is that] both the revised Punkhorn Point abutment and the approach to it have been enlarged, with resultantly greater negative impacts on protected [wetlands] resource areas." Id. He testified that "Sheet two of the truss bridge is significantly heavier than the [original] timber bridge proposal[,] . . . with significantly longer spans the loads transferred to the end abutments (and intermediate piers) are significantly larger than the 14 foot timber spans," and, accordingly, "the concrete abutment and concrete approach wing walls are significantly larger." Id.

Mr. Daylor also testified that "the [project] site cannot accommodate an assembly and launch [of the steel bridge] from Punkhorn Point as Mr. Bunker testifie[d]," and as a result, "the only alternative is to assemble the [steel bridge] spans elsewhere, barge them to the site and then

erect them at the site by a large barge-mounted crane." Mr. Daylor's PFT, ¶ 14. He testified that

alternative construction would "rais[e] a significant risk to land containing shellfish resources

from the heavy barge grounding out in the shallow creek" because "[t]he three assembled bridge

spans [would] weigh 45,600 [pounds] (22.8 tons), 54,720 [pounds] (27.4 tons), and 82,080

[pounds] (41 tons) respectively," and "would most likely require both a heavy crane barge and a

second barge carrying the assembled bridge sections." Id. He testified that the Petitioners

presented "no evidence . . . that these barges could even fit in the creek" and no evidence "of the

impacts of such an approach on coastal resources." Id.

> **b.**  **Ms. Ball's Testimony**

Ms. Ball is a Project Manager and Senior Ecologist at the Horsley Witten Group, Inc., an

environmental consulting firm in Sandwich, Massachusetts, with more than 20 years of

significant professional experience as a wetlands consultant. Ms. Ball's PFT, ¶ 1. Her expertise

is in wetlands science, botany, ecology, rare species and wildlife habitat assessments, impact

assessment, wetlands permitting, and environmental policy evaluation. Id. She holds a Bachelor

of Science degree in Biology from Muhlenberg College in Allentown, Pennsylvania (1991) and a

Master of Science degree in Plant Biology from the University of Massachusetts, Amherst,

Massachusetts (1994). Id., ¶ 2; Exhibit 1 to Ms. Ball's PFT.

Ms. Ball also is a Professional Wetland Scientist ("PWS"), certified through the Society

of Wetland Scientists ("SWS"),[59] and a Certified Wetland Scientist in the State of New

Hampshire based on a certification process which has an eligibility component and requires both

---

[59] The Society of Wetland Scientists is an international organization based in Madison, Wisconsin with over 3,000
members whose mission "is to promote understanding, conservation, protection, restoration, science-based
management, and sustainability of wetlands." http://www.sws.org/About-SWS/overview.html.

written and field examinations.[60]  Ms. Ball's PFT, ¶ 3.  She is a member of SWS and the

Association of Massachusetts Wetland Scientists ("AMWS"),[61] two professional organizations

that promote wetland science and policy and the exchange of information related to wetlands.

Id., ¶ 4.  She is also a member of the Board of Directors for the Massachusetts Association of

Conservation Commissions ("MACC"), a state-wide organization dedicated to providing

environmental education and training for members of local Conservation Commissions

and advocating for environmental protection.  Id.

During the course of her career, Ms. Ball has performed hundreds of field delineations of

coastal and freshwater wetlands resource areas in accordance with federal, state, and local

delineation requirements.  Id., ¶ 5.  She has also prepared numerous permit applications, written

project narratives, and reviewed projects on behalf of local Conservation Commissions requiring

federal, state, and/or local permits pursuant to laws, regulations, and policies governing wetlands

protection, including the MWPA and the Wetlands Regulations.  Id.  She frequently appears

before local Conservation Commissions and state and federal regulatory authorities as a project

representative or as a municipal consultant.  Id.  She has also served as an expert witness in the

areas of wetland delineation and has provided expert testimony in evidentiary Adjudicatory

Hearings involving Department issued wetlands permits and has served as an expert witness in

Massachusetts Land Court.  Id., ¶ 6.

Ms. Ball testified that she is very familiar with the Petitioners' original Project Plan and

revised Project Plan as a result of having served as the Intervenor Mashpee Wampanoag Tribe's

---

[60] See https://www.nhes.nh.gov/elmi/products/licertocc/documents/wetlands.pdf.

[61] AMWS was established in 1991 and is comprised of wetlands professionals from a number of states, including
Massachusetts, Connecticut, Rhode Island, New Hampshire, and Maine, who have diverse expertise in the wetlands
field.  http://www.amws.org/the_organization.html. "[Its] members are wetland scientists, soil evaluators,
engineers, conservation commission agents, regulatory officials[,] and other environmental professionals." Id.

wetlands expert since September 2014, when the Petitioners first presented their original Project

Plan to the MCC. Id., ¶¶ 7-8. As part of her environmental consulting work for the Tribe, she

visited the project site on September 26, 2014 with Mr. Green, the Tribe's Director of Natural

Resources, accessing the site from the Town Landing at the end of Punkhorn Point Road and

traversing the channel between the mainland and the Salt Marsh surrounding Gooseberry Island.

Id., ¶ 8. During the site visit, she observed the expanse of Salt Marsh along the Mashpee

mainland and surrounding Gooseberry Island, and the approximate location of the proposed

bridge. Id. She also observed several members of the Intervenor Mashpee Wampanoag Tribe

gathering and tending to harvested shellfish (primarily oysters) and observed shellfish along the

sediment surface, growing among the Salt Marsh grasses, and in the waters. Id.

Ms. Ball testified that the Project site is located within an area that is mapped as shellfish

habitat by the Town of Mashpee and DMF and also protected under the Intervenor Mashpee

Wampanoag Tribe's Private Shellfish Grant that it received from the Town in 1977 pursuant to

G.L. c. 130, §§ 57 – 68A. Id., ¶ 9.[62] She testified that the Tribe's Shellfish Grant is valid

through 2027 and occupies the entirety of the tidal creek between the Mashpee mainland at

Punkhorn Point Road and Gooseberry Island and nearly encircles the Island. Id.

Ms. Ball testified that under the Wetlands Regulations at 310 CMR 10.32(1), "Salt

marshes are significant to protection of marine fisheries, wildlife habitat, and where there are

---

[62] Mr. Green, the Intervenor Mashpee Wampanoag Tribe's Assistant Director of Natural Resources, corroborated Ms. Ball's testimony. Pre-filed Direct Testimony of George "Chuckie" Green ("Mr. Green's PFT"), ¶¶ 1-2. He testified that the Tribe "has operated a shellfish grant around Gooseberry Island and in Popponesset Bay Proper since 1977." Id., ¶ 2. He testified that "[i]n 2008 the Tribe was awarded a Tribal Wildlife Grant (TWG) and established the Popponesset Bay Restoration Project," which "was designed to improve water quality by the creation of a sustainable oyster aquiculture farm to reduce nitrogen in the estuary." Id., ¶ 3. He testified that "[i]n 2012 the Tribe received the [federal Environmental Protection Agency's ("EPA")] Environmental Merit Award for demonstrating that [the Tribe] could assist in restoration through this process," and that "[t]he Tribe sustains this project through the sale of shellfish which could be affected with the [Applicant's] introduction of a Bridge, house and septic system" at the project site. Id., ¶ 4.

**In the Matter of Gooseberry Island Trust and SN Trust**, OADR Docket No. WET-2015-016
Recommended Final Decision
Page 45 of 53

shellfish, to protection of land containing shellfish," and as a result, "any destruction of the salt marsh that would have an adverse effect on the productivity of the salt marsh, in turn, would also directly impact the productivity of Land Containing Shellfish." Id., ¶ 14. Under the Wetlands Regulations at 310 CMR 10.34(4), "[e]xcept as provided in 310 CMR 10.34(5),[63] any project on land containing shellfish shall not adversely affect such land or marine fisheries by a change in the productivity of such land caused by: . . . changes in water quality, including, but not limited to, other than natural fluctuations in the levels of salinity, dissolved oxygen, nutrients, temperature or turbidity, or the addition of pollutants." Id.

Ms. Ball supported her testimony that the project area is Land Containing Shellfish by relying on a March 27, 2014 letter written by DMF that assessed the detrimental impact that the Applicant's construction of a timber bridge would have on that area. Ms. Ball's PFT, ¶ 15; Exhibit 6 to Ms. Ball's PFT. DMF stated the following in the letter, which I find to be also pertinent to the Petitioners' steel bridge alternative.

DMF confirmed that "[t]he Mashpee Wampanoag Tribe possesses a shellfish grant that is located on the north, east, and south-facing sides of Gooseberry Island [that] . . . has been in operation since the 1970's." Exhibit 6 to Ms. Ball's PFT. DMF stated that the Tribe was "currently grow[ing] out American oysters [at the project site], but [wanted] the opportunity to grow out other shellfish species as well." Id. DMF stated that "[q]uahogs were stocked on the south side of [Gooseberry] [I]sland while soft shell clam seed was planted on the north side of

---

[63] 310 CMR 10.34(5) provides that:

> Notwithstanding the provisions of 310 CMR 10.34(4), projects which temporarily have an adverse effect on shellfish productivity but which do not permanently destroy the habitat may be permitted if the land containing shellfish can and will be returned substantially to its former productivity in less than one year from the commencement of work, unless an extension of the Order of Conditions is granted, in which case such restoration shall be completed within one year of such extension.

the island." Id.[64] DMF stated that although "[t]he waters surrounding Gooseberry Island are

classified 'Conditionally Approved,'" meaning that "shellfish may not be harvested from April 1

to October 31 of any year," this classification "does not negate its value as shellfish habitat." Id.

Additionally, DMF stated that while shellfish cannot be harvested during that period, the

shellfish "nevertheless serve as important brood stock for the area and provide forage for

numerous other species of finfish and invertebrates." Id.

Ms. Ball testified that the Petitioners' Revised Project Plan "proposes a steel span bridge

that avoids the placement of pilings within Salt Marsh with a narrower profile that allegedly

allows for greater light penetration," but that "this revised design introduces the potential for

additional adverse effects on the coastal resource areas that must be considered." Ms. Ball's

PFT, ¶ 20. She testified that "[i]n [her] opinion, direct avoidance of salt marsh impacts alone

would not eliminate impacts to salt marsh . . . ." Id., ¶ 21. She testified that "[t]he revised bridge

design is supported by two 9 x 14-inch pile bent supports with concrete bridge abutments at

either end [that] . . . would continue to be placed within close proximity to the Salt Marsh – as

close as 3 to 4 feet on the eastern-most pile bent structure." Id. She testified that "[t]he

placement of these massive structures in close proximity to the Salt Marsh in a Velocity Zone

raises concerns regarding the potential for ice build up around the pilings during winter months,

which has the potential to scour the Salt Marsh, leading to adverse effects on the productivity of

the salt marsh." Id. She testified that "[a]dditional considerations for potential adverse effects

on the Salt Marsh include the potential for accumulation of debris following storm events that

could be exacerbated by the proximity of the pile bent supports to the Salt Marsh." Ms. Ball's

PFT, ¶ 21.

---

[64] Mr. Green testified that "[s]oftshell claims exist within the footprint of the bridge and [the Intervenor Mashpee Wampanoag Tribe's] members partake in Sustenance Harvest of ribbed mussels, softshell clams, and quahogs annually." Mr. Green's PFT, ¶ 8.

Ms. Ball took issue with Mr. Bunker's and Mr. Forns' testimony that the Petitioners' steel bridge alternative will result in decreased impacts to wetlands resources compared to the initial timber bridge design. Id., ¶¶ 22-26. Specifically, she refuted their testimony that the open grating system in the deck of steel bridge will result in greater light penetration to the underlying Salt Marsh surface than the originally proposed timber bridge. Id. She testified that Mr. Bunker and Mr. Forns "overlooked . . . that the intended advantages for using open grid planking to allow light penetration to vegetation beneath are overshadowed by the potential for vehicular pollutants to fall through the open grating and onto the sensitive resources below." Id., ¶ 23. She testified that "[w]hile this type of design may be appropriate for a smaller dock or pier that supports only foot traffic, this may not be an appropriate design in the context of this project." Id.

Ms. Ball also refuted Mr. Bunker's and Mr. Forns testimony by relying on a recent (2012) study on alternative decking materials for elevated structures over Salt Marshes that was conducted in Georgia by the University of Georgia's Skidaway Institute of Oceanography ("the Skidaway Institute Study").[65]   Ms. Ball's PFT, ¶ 24; Exhibit 8 to Ms. Ball's PFT. The Skidaway Institute Study "revealed that open grating on elevated structures offer very little amelioration in terms of shading to underlying vegetation." Ms. Ball's PFT, ¶ 24; Exhibit 8 to Ms. Ball's PFT. Specifically, the results of the Skidaway Institute Study demonstrated that "alternative decking

---

[65] The University of Georgia's Skidaway Institute of Oceanography "is a multidisciplinary research and training institution located on Skidaway Island near Savannah[,] [Georgia], which "was founded in 1967 . . . to conduct research in all fields of oceanography." http://www.skio.uga.edu/about/uga-skidaway-institute-story. "The Institute's primary goals[,] [include] further[ing] [the] understanding of marine and environmental processes, [and] conduct leading-edge research on coastal and marine systems . . . ." Id. "Institute scientists conduct basic research across a broad range of subdisciplines, covering not only local economic and environmental issues, but also global processes and phenomena . . . ." Id. The Institute's research activities are funded by federal and state agencies, including by the National Science Foundation ("NSF"), the National Oceanic and Atmospheric Administration ("NOAA"), the U.S. Department of Energy ("DOE"), the U.S. Environmental Protection Agency ("EPA"), the Office of Naval Research ("ONR"), and the Georgia Department of Natural Resources. Id.

materials do not ameliorate the impacts of dock shading" and that the "the elevation of the sun is only high enough to allow sunlight to penetrate through grated materials during spring, when [sunlight] penetration is relatively limited, and during summer, when penetration is at its greatest." Ms. Ball's PFT, ¶ 24; Exhibit 8 to Ms. Ball's PFT, at p. 4. The Skidaway Institute Study noted that "[e]ven [during the summer], grated materials provide less than 10% additional PAR [photosynthetically active radiation, i.e., light level intensity] under docks when compared to a traditional planked walkway." Id. The Skidaway Institute Study also pointed out that "[b]ecause the elevation of the sun is related to latitude, [the study's] results are applicable from Skidaway Island [in Georgia] north along the US east coast." Id. Ms. Ball testified that "[r]esults in northern latitudes would [be] . . . lesser light penetration beneath this alternative grate decking." Ms. Ball's PFT, ¶ 24.

Ms. Ball testified that "[b]ased upon the results of [the Skidaway Institute Study], . . . the proposed [steel bridge alternative due], in part due to its massive size and its east-west orientation, would continue to shade the underlying salt marsh vegetation, and lead to adverse effects on the productivity of the Salt Marsh and the [growth] and composition of the salt marsh vegetation." Id., ¶ 25. As a result, Ms. Ball opined that she "[did] not believe that the revised bridge design would be protective of the Salt Marsh or the other adjacent coastal resource areas or the interests they protect under the [MWPA]." Id., ¶ 26. She testified that "[w]hile the project would avoid direct Salt Marsh impacts, . . . [the] design would not address the long term adverse effects on the water quality and the potential for Salt Marsh degradation that continues to prohibit the ability of this project to meet the performance standards under the . . . Wetlands . . . Regulations." Id.

Ms. Ball also took issue with the Petitioners' mitigation plan to provide "salt marsh restoration/re-vegetation" to mitigate for the steel bridge's impacts to Salt Marsh. Id., ¶ 29. She testified that "rather than serving as mitigation, this mitigation plan will likely have unintended consequences and impacts on . . . Coastal Beach/Tidal Flats and Land Containing Shellfish and areas designated as part of the Tribe's Aquaculture Grant," and, as a result, "[a]ny claims that the [revised] proposed project would improve existing conditions, would therefore be flawed." Id.

## CONCLUSION

Based on the testimonial and documentary evidence introduced at the Adjudicatory Hearing as discussed above, I recommend that the Department's Commissioner issue a Final Decision: (1) affirming the Department's SOC denying the Petitioners' original proposed Project because the Petitioners waived any objections to the SOC by submitting a Revised Project Plan to the Department in this appeal; and (2) denying review and approval of the Petitioners' Revised Project Plan pursuant to the Department's Plan Change Policy because the Petitioners' proposed steel bridge alternative is substantially different from their originally proposed timber bridge and increases wetlands impacts to Salt Marsh and Land Containing Shellfish. As a result, the Petitioners' Revised Project Plan cannot be reviewed and approved in this appeal, but must be submitted to the MCC for review pursuant to a new NOI.

Date: 06/16/17

Salvatore M. Giorlandino
Chief Presiding Officer

## NOTICE-RECOMMENDED FINAL DECISION

This decision is a Recommended Final Decision of the Chief Presiding Officer. It has been transmitted to the Commissioner for his Final Decision in this matter. This decision is therefore not a Final Decision subject to reconsideration under 310 CMR 1.01(14)(d) and/or 14(e), and may not be appealed to Superior Court pursuant to G.L. c. 30A. The Commissioner's Final Decision is subject to rights of reconsideration and court appeal and will contain a notice to that effect. Because this matter has now been transmitted to the Commissioner, no party and no other person directly or indirectly involved in this administrative appeal shall neither (1) file a motion to renew or reargue this Recommended Final Decision or any part of it, nor (2) communicate with the Commissioner's office regarding this decision unless the Commissioner, in his sole discretion, directs otherwise.

<u>**SERVICE LIST**</u>

**Petitioners/Applicants:**    Gooseberry Island Trust and
SN Trust;

    **Legal representative:**    Brian J. Wall, Esq.
Troy Wall Associates
90 Route 6A
Sandwich, MA 02563
**e-mail:** bjw@troywallassociates.com;

**The Local Conservation Commission:**    Mashpee Conservation Commission
    c/o    Andrew R. McManus , Conservation Agent
Cynthia Bartos , Administrative Secretary
16 Great Neck Road North
Mashpee, MA 02649
**e-mail:** amcmanus@mashpeema.gov
conservation@mashpeema.gov;

    **Legal Representatives:**    Patrick J. Costello, Esq.
Kathleen E. Connelly, Esq.
Louison, Costello, Condon &
Pfaff, LLP
101 Summer Street
Boston, MA 02110
**e-mail:** Pcostello@lccplaw.com
**e-mail:** KConnolly@lccplaw.com;

**Intervenors Robert A. Wolpe, Michelle A. Wolpe, James C.
Atkins, Jr., and John J. Weltman:**

    **Legal Representatives:**    Brian M. Hurley, Esq.
John E. Bowen, Esq.
Rackemann, Sawyer & Brewster
160 Federal Street
Boston, MA 02110
**e-mail:** bhurley@rackemann.com
**e-mail:** jbowen@rackemann.com;

**(continued next page)**

(continued from preceding page)

**Intervenors Mashpee Wampanoag Tribe and 12 of its Tribal Members:**

Legal Representatives:     Mark C. Tilden, Esq.
Tilden Toelupe LLC
300 E Miller Ct
P.O. Box 1296
Castle Rock, CO 80104
**e-mail:** mtilden@tildentoelupe.com;

The Department:     Jim Mahala, Section Chief, Wetlands Program
MassDEP/Southeast Regional Office
Bureau of Water Resources
20 Riverside Drive
Lakeville, MA 02347
**e-mail:** Jim.Mahala@state.ma.us;

Mark Bartow, Wetlands Analyst
MassDEP/Southeast Regional Office
Bureau of Water Resources
20 Riverside Drive
Lakeville, MA 02347;
**e-mail:** Mark.Bartow@state.ma.us;

Legal Representative:     Danah Tench, Deputy General Counsel
MassDEP/Office of General Counsel
One Winter Street
Boston, MA 02108;
**e-mail:** Danah.Tench@state.ma.us;

cc:     Shaun Walsh, Chief Regional Counsel
MassDEP/Southeast Regional Office
Office of General Counsel
20 Riverside Drive
Lakeville, MA 02347
**e-mail:** Shaun.Walsh@state.ma.us;

Leslie DeFilippis, Paralegal
MassDEP/Office of General Counsel
One Winter Street
Boston, MA 02108.